No. 26          September 15, 2016          233

# IN THE OREGON TAX COURT
## REGULAR DIVISION

COMCAST CORPORATION,
*Plaintiff,*

*v.*

DEPARTMENT OF REVENUE,
*Defendant.*

(TC 4909)

On remand from the Oregon Supreme Court, the court considered the issue of the determination of the maximum assessed value (MAV) of Plaintiff's (taxpayer's) property under Measure 50. Defendant (the department) argued that the new property exception to the 3% Limit (either the constitutional or statutory limit) justified an increase in the MAV for taxpayer's properties of more than 130 percent. That, coupled with a substantial increase in real market value (RMV) determined by the department, resulted in an increase in the assessed value (AV) for taxpayer's properties in the order of hundreds of millions of dollars. In addition, the determination of the MAV would have an effect on future years, as once MAV has been determined based upon an exception to the 3% Limit, the calculation of MAV in future years would be subject to the 3% Limit in those years, determined by reference to the exception MAV. Taxpayer argued that the department's assessment was incorrect because the MAV determined by the department for tax year 2009-10 exceeded the 3% Limit. The department acknowledged that it increased taxpayer's MAV more than the 3% Limit, but relied on the new property exception to the 3% Limit. The court ruled that the department's action of adding taxpayer's property to the central assessment tax roll did not, absent some action or event attributable to taxpayer, qualify as an "addition" to a property tax account for purposes of the new property exception under ORS 308.149(5)(a)(C). Accordingly, because the majority of taxpayer's property was existing and subject to central assessment before the assessment date of the immediately preceding tax year, the court held that the new property exception did not apply to that property in the tax year in question. However, the court did not prohibit the department from using the new property exception at all, as taxpayer conceded that it had $86 million in new property additions. The court therefore concluded that the record did not support a decision on MAV and that further evidentiary proceedings were warranted.

Oral argument on cross-motions was held March 16, 2016, in the courtroom of the Oregon Tax Court, Salem.

Joseph M. DePew, Sutherland Asbill & Brennan LLP, Atlanta, and Cynthia M. Fraser, Garvey Schubert Barer PC, Portland, filed the motion and argued the cause for Plaintiff (taxpayer).

Marilyn J. Harbur, Senior Assistant Attorney General, Department of Justice, Salem, filed the cross-motion and

argued the cause for Defendant Department of Revenue (the department).

Decision rendered September 15, 2016.

**HENRY C. BREITHAUPT, Judge.**

## I.    INTRODUCTION

This case is on remand from the Oregon Supreme Court. That Court held that property owned by Comcast Corporation (taxpayer) and used to provide cable television, voice over internet protocol (VOIP), and internet services was subject to central assessment in tax year 2009-10. *Comcast Corp. v. Dept. of Rev.*, 356 Or 282, 337 P3d 768 (2014).

## II.    MEASURE 50 AND MAV

This order concerns the principles regarding the determination of the maximum assessed value (MAV) of taxpayer's property under Measure 50—codified in Article XI, section 11, of the Oregon Constitution—and the statutes implementing Measure 50. There are other issues before the court not addressed in this order.[1]

Before Measure 50, the base for property taxation, to which tax rates were applied, was the real market value (RMV) of the property—the amount at which a property would sell in an arm's-length transaction between an informed buyer and informed seller.[2] ORS 308.205.[3] In effect, the value at which a property was assessed and the value upon which taxes were actually levied, was, for any given year, equal to its RMV. If, in a subsequent year, the property's RMV went up, so did the assessed value (AV) and

---

[1] As previously ordered, still pending on remand are taxpayer's discrimination claims under the Oregon and federal constitutions, and taxpayer's claim under the Internet Tax Freedom Act. *See Comcast Corp. II v. Dept. of Rev. (TC 4909)*, 22 OTR 64 (2015) (Order on Scope of Remand). In addition, because the court's ruling here only governs the principles applicable in determining the MAV and AV under Measure 50, there may yet be need for a decision on the final value calculation under these principles.

[2] This is true unless the property is subject to special assessment, in which case it will be assessed at a value other than its RMV. *See, e.g.*, ORS 308A.050 - 308A.128 (addressing farm use special assessment).

[3] Unless otherwise noted, all references to the Oregon Revised Statutes (ORS) are to 2009. The definition in ORS 308.205 has not materially changed since at least 1995, the last bound version of the ORS before Measure 50.

the associated tax burden. Valuation disputes were more prevalent before Measure 50 because successfully challenging an assessor's conclusion as to a property's RMV in any year would change the tax burden for that year, and could become an adjudicated value under ORS 309.115 for a limited number of future years.[4]

Measure 50 effected a change in the mechanism for computation of the tax base against which property tax rates were applied. It did so by introducing the concept of maximum assessed value (MAV) for property. Measure 50 also dictated that the AV of property in any year must be the lesser of the RMV or the MAV of that property for the year in question. Or Const, Art XI, §§ 11(1)(b), (f); *see also* ORS 308.146(2).

Under Measure 50, if the RMV determined by *an assessor* is above the MAV applicable for any given year, the MAV, being lesser, will generally be the AV. Challenging the RMV will produce no economic relief for a taxpayer unless *the taxpayer* is asserting that the RMV of the property is below the MAV.[5] A corollary to this concept is that even if an assessor can defend a very significant RMV for property, that RMV will not produce property tax revenue to the extent that it exceeds the MAV of the property. Indeed, that is the situation presented for decision in this case. Defendant (the department) assessed taxpayer under the central assessment regime, found in ORS 308.550 to 308.665. This permitted the department to include, in the RMV of all of taxpayer's properties, significant additional value inherent in the intangible property of taxpayer. The limiting factor and the issue here is whether the MAV of taxpayer's properties is less than the RMV of those properties.

---

[4] Unless otherwise specified, "assessor" refers to either the local assessor or the Department of Revenue.

[5] In cases where a taxpayer is not asserting an RMV lower than the MAV, this court has held that no justiciable controversy exists. *Paris v. Dept. of Rev.*, 19 OTR 519 (2008). One exception to this rule is "compression" under Article XI, section 11b, of the Oregon Constitution (commonly known as Measure 5). Measure 5 limits the amount of taxes that can be collected on a property. These limits are expressed as a number of dollars for each $1,000 of RMV. Or Const, Art XI, § 11b(1). Accordingly, in cases of compression, a taxpayer asserting an RMV lower than the RMV determined by the assessor—but higher than the MAV— may still have a justiciable controversy.

Under Measure 50, once a MAV has been determined for property, the MAV of the property generally cannot, in the future, increase more than three percent from the prior year's MAV (the 3% Constitutional Limit). Or Const, Art XI, § 11(1)(b). The 3% Constitutional Limit provides for a three percent ceiling, but it does not provide for a calculation of MAV. That calculation is provided for by statute.

ORS 308.146(1) provides that the MAV of property in any given year is the greater of 100 percent of the prior year's MAV or 103 percent of the prior year's AV (the Statutory Limit). The Statutory Limit is slightly different from— but not contrary to—the 3% Constitutional Limit.[6] The 3% Constitutional Limit requires that the MAV not increase by *more* than three percent in any given year. The Statutory Limit can result in an increase in MAV of less than three percent in some years. The MAV will only increase where 103 percent of the prior year's AV exceeds the prior year's MAV.[7] Where it is not important to distinguish between the 3% Constitutional Limit and the Statutory Limit, the court will refer to both limits together as the 3% Limit.

Although calculation of the 3% Limit is straightforward, disputes can arise, and in this case have arisen, over whether one of a limited number of exceptions to the 3% Limit exists.[8] These exceptions are provided for by Measure 50 and implemented in ORS 308.146(3).

There are six exceptions to the operation of the 3% Limit. In each of these an assessor can determine an increase to MAV that exceeds the 3% Limit. In such cases

---

[6] Neither party asserts that the Statutory Limit violates Measure 50.

[7] See the Appendix to this order for examples of the interactions between AV, MAV, and RMV.

[8] The term "exception" to the 3% Limit is something of a misnomer. It does not mean that the 3% Limit is ignored. For example, in the case of new property, the 3% Limit still applies to the property existing in the prior year. *See* ORS 308.153(1)(a); ORS 308.146(1). The "exception" to the 3% Limit is more accurately described as a "determination" of MAV as to *that new property. See* ORS 308.153 (1)(b), (2)(a). The current year's MAV is equal to the addition of the previously existing property (with a MAV subject to the 3% Limit) and the newly existing property (with a MAV newly established for it). ORS 308.153(1). The court uses the term "exception" both because it has taken root in legal parlance and because it has a basis in statute. *See* ORS 308.146(2) ("Except as provided in ***."); *but cf.* Or Const, Art XI, § 11(1)(b) (no use of the term "except" or "exception").

an exception value is determined. The exception value is based upon the value of the property or element of property subject to the exception multiplied by the "changed property ratio" (CPR).[9]

There is no dispute that computation of MAV may escape the 3% Limit only where property is, for the current assessment year, *i.e.*, as of the assessment date:[10] (1) new; (2) partitioned or subdivided; (3) rezoned; (4) omitted from the assessment roll; (5) disqualified from exemption, partial exemption, or special assessment; or (6) subjected to lot line adjustment. Or Const, Art XI, § 11(1)(c); ORS 308.146(3).

The only exception that the department relies upon is the exception for new property.[11] The department argues

---

[9] The CPR is a colloquial term used to describe the ratio used in determining the MAV for property when an exception has been satisfied. The MAV calculation for new property is contained in ORS 308.153. ORS 308.153(1) provides that the MAV equals the sum of (1) the 3% Limit and (2) the product of the RMV of the new property multiplied by the CPR. The CPR is equal to the ratio of average MAV over average RMV for the assessment year for property located in the same area and of the same class, but no more than 1.00. Or Const, Art XI, § 11(a)(c); ORS 308.153(1)(b).

[10] Understanding the time periods used in the assessment statutes is critical. An *assessment year* is a *calendar year*. ORS 308.007(1)(b); *see also* ORS 308.007 (1)(d) (defining "year" as "assessment year"). The *assessment date*, the date on which value is determined for the *assessment year*, is January 1 at 1:00 a.m. ORS 308.007(1)(a); *see* ORS 308.210, ORS 308.250. The *tax year* is a fiscal period that runs from July 1 to June 30. ORS 308.007(1)(c). The *assessment year* relates to the *tax year* beginning in the same *calendar year*. *See* ORS 308.007(2). To clarify: an *assessment date* of January 1, 2009, (at 1:00 a.m.) corresponds to an *assessment (calendar) year* of 2009, which corresponds to a *tax year* running from July 1, 2009 to June 30, 2010 (tax year 2009-10).

[11] During oral argument, the department confirmed that this is the only exception at issue. The court notes, however, that there are hints in the department's briefing that suggest the department holds that intangible property is *exempted* from local assessment. There are also hints that transition to central assessment could be seen as a loss of that alleged exemption. However, ORS 307.030(2) provides that, except in central assessment, "intangible personal property is not *subject* to assessment and taxation." (Emphasis added.)

There is a difference between *not being subject* to assessment and *being subject to but exempted from* assessment. This is highlighted by the fact that in all circumstances, except those not relevant here, exemption requires an application for exemption by a taxpayer, and property that is exempt can be *disqualified* from exemption. Indeed, such a disqualification event triggers an exception to MAV. There is no similar application or possible disqualification for intangible property in local assessment, because it is simply not subject to assessment and taxation.

The department acknowledges this, but fails to see the point. In its briefing, the department notes:

that the new property exception to the 3% Limit justifies an increase in the MAV for taxpayer's properties of more than 130 percent. This, coupled with a substantial increase in RMV determined by the department, resulted in an increase in the AV for taxpayer's properties in the order of hundreds of millions of dollars.

Further, the parties here are not simply arguing about the department's determination of MAV as it affects the taxes levied on taxpayer's property in tax year 2009-10. That determination will have effects beyond that year. Recall that, before Measure 50, valuation disputes affected the tax burden only for the year of the dispute. In subsequent years, the question of RMV, and therefore the base for taxation, could be litigated anew.[12] Under Measure 50, however, once a MAV has been determined based upon an exception to the 3% Limit, the calculation of MAV in future years is subject to the 3% Limit in those years, determined by reference to the exception MAV. Or Const, Art XI, § 11(1)(d).

With this perspective, the court turns to the facts and arguments in this case.

### III.   FACTS AND PROCEDURAL HISTORY

Taxpayer has three lines of business in which it provides services for its customers. They are cable television, internet access, and VOIP. Taxpayer's VOIP property has, for many years, been subjected to central assessment by the department without objection from taxpayer. Taxpayer's cable television and internet access property, however, was not subjected to central assessment by the department until tax year 2009-10. Before that, taxpayer's cable television and internet access property was subjected to local assessment by the counties.

---

"Comcast argues that its previously unassessed intangible property cannot be considered exempt property and added to the central assessment roll because it was not 'disqualified' from exemption. This argument ignores the fact that this property never 'qualified' for exemption. Intangible property is not subject to assessment on the local assessment rolls, as provided by law in ORS 307.030(2)."

The exception for disqualification from exemption does not apply here.

[12]  There are only a few limited exceptions to this rule. *See, e.g.*, ORS 309.115.

In tax year 2009-10, the department for the first time subjected all of taxpayer's properties to central assessment as a unit. The department issued a notice of proposed assessment on May 22, 2009. Taxpayer objected to that notice on June 12, 2009. On July 10, 2009, the department rejected taxpayer's objections and, on July 14, 2009, the department issued an opinion and order determining that taxpayer was subject to central assessment with an RMV of $1,013,000,000. On August 19, 2009, taxpayer filed a complaint in the Magistrate Division of this court, before successfully petitioning for special designation to the Regular Division in September 2009. Taxpayer argued before this court that its cable television and internet access property was not subject to central assessment because neither service was a "communication" service under ORS 308.515 (1)(h).

This court found that taxpayer's cable television service was *not subject* to central assessment as a communication service. This court determined that taxpayer's internet access property *would have been subject* to central assessment, but that the internet access service was integrated with the cable television service. Further, this court determined that taxpayer's cable television service was the primary use of the property. Accordingly, because this court found that the cable television service was not subject to central assessment, this court determined that the internet service was also not subject to central assessment. *Comcast Corp. v. Dept. of Rev.*, 20 OTR 319, 334-37 (2011).

The department appealed to the Supreme Court. The court determined that all of taxpayer's property was, in the 2009-10 tax year and for several years prior to that, subject to central assessment as property used for communication services. *Comcast Corp.*, 356 Or at 332-34. However, the court did not determine the MAV or AV of taxpayer's properties, instead remanding the case for this court to address Measure 50 and the 3% Limit as well as other matters that had been rendered moot by the initial decision of this court as to those properties.[13]

---

[13] As previously stated, taxpayer's discrimination and ITFA claims are still pending before this court. On remand, the department argued that no issue

For tax year 2008-09, the year prior to the year at issue in this case, the real and tangible personal property assessed in various counties had, in the aggregate, an AV and an RMV of $212,044,900, and a MAV of $361,702,602.[14] Taxpayer's centrally assessed VOIP property had an AV and RMV of $32,000,000, with a MAV of $72,381,600. In total, taxpayer's property on the tax rolls had an RMV of $244,044,900 and a MAV of $434,084,202. The total AV of all property of taxpayer was, therefore, $244,044,900.

For tax year 2009-10, the department subjected taxpayer's cable television, VOIP, and internet services property to central assessment as one unit.[15] Applying valuation rules used in central assessment, which allow for the assessment and taxation of property in Oregon based on an allocated value of all of taxpayer's properties wherever located, including intangible property,[16] the department determined that the RMV of all of taxpayer's property was $1,013,000,000. On the basis that this was the first year that the department was assessing all of taxpayer's property as centrally assessed property, the department treated all of taxpayer's property as new property, and determined a MAV of $1,013,000,000. Taxpayer concedes that there was $86 million of new net tangible property additions, but disputes that any other portion of its property was new property for tax year 2009-10.

The change in assessment values between tax years 2008-09 and 2009-10 is shown in the following chart. Remember that the 3% Limit only applies to the MAV of

---

survived on remand except the Measure 50 issue. This court rejected that position. *Comcast Corp. II*, 22 OTR 64 (2015). It has been rejected by the Supreme Court as well. *See DIRECTV, Inc. v. Dept. of Rev.*, 360 Or 21, 25 n 1, 377 P3d 568 (2016).

[14] Because the AV for this property is lower than the MAV, the AV must necessarily be equal to the RMV.

[15] The term "unit" is not a technical term for purposes of Measure 50, but it is significant for purposes of determining RMV in central assessment in ORS 308.505 to 308.665. In central assessment, the department "may value the entire property, both within and without the State of Oregon, as a unit," and then "ascertain the property subject to taxation in Oregon" by some measure of apportionment. ORS 308.550; ORS 308.555.

[16] ORS 307.030(2).

property.[17] The percentage increase with respect to RMV and AV is shown for informational purposes only.

|                   | AV             | MAV             | RMV             |
|-------------------|----------------|-----------------|-----------------|
| Tax Year 2008-09  | $244,044,900   | $434,084,202    | $244,044,900    |
| Tax Year 2009-10  | $1,013,000,000 | $1,013,000,000  | $1,013,000,000  |
| Percentage Change | 315% Increase  | 133% Increase   | 315% Increase   |

## IV.   THE ARGUMENTS OF THE PARTIES

Measure 50 does not purport to only apply to certain types of property. Consistent with that fact, the parties concede that Measure 50 and the implementing statutes apply to both locally and centrally assessed property. Taxpayer argues that the department's assessment is incorrect because the MAV determined by the department for tax year 2009-10 exceeds the 3% Limit. The department acknowledges that it increased taxpayer's MAV more than the 3% Limit, but relies on the new property exception to the 3% Limit. The department treated all of taxpayer's properties, including previously assessed real and tangible personal property, as new property. At the center of this case is a dispute regarding whether, or to what extent, the transition from local assessment to central assessment qualifies as an event triggering the new property exception to the 3% Limit.[18]

On the question of new property, taxpayer concedes that it had $86 million in new property for purposes of the MAV for tax year 2009-10. Therefore, taxpayer concedes that some upward adjustment to the MAV calculated under the 3% Limit for tax year 2009-10 is appropriate under ORS

[17] This is commonly misunderstood. The MAV places an upper limit on the tax base of property, which base is used to calculate taxes. However, the MAV is *not* a limit on increases to the tax burden. So long as the AV does not exceed the MAV, the AV—and the associated tax burden—can increase more than three percent. *See* Appendix, 22 OTR at 260.

[18] To the extent that taxpayer acknowledges addition of $86 million in new property, it does not question the application of the new property exception. The total amount of new property will be the subject of further proceedings, discussed below in Section VI (B) as the department may dispute that there is only $86 million in new property. *See* 22 OTR at 258.

308.153. However, taxpayer challenges the CPR of 1.00 used by the department in calculating any exception value. Taxpayer also asserts it had no other new property subject to assessment as of January 1, 2009.

Neither party has presented evidence supporting an argument or finding that taxpayer's operations changed in any material way from the year 2000 up until 2009-10.[19] As to the cable and internet businesses, those operations were digital at least by tax year 2008-09, and digital thereafter. Nor did the VOIP business change. Accordingly, neither party disputes that taxpayer was subject—even if not subjected—to central assessment on its cable television and internet services property well before tax years 2008-09 and 2009-10.[20] A more precise determination of when the transition from analog operations to digital operations is not required for resolution of this case. The department, for whatever reason, simply chose not to subject all of taxpayer's properties to assessment under the central assessment regime until tax year 2009-10.[21]

## V.   ISSUE

The issue in this proceeding is the proper construction and application of the "new property" exception to Measure 50.

---

[19] According to the exhaustive review of history conducted by the Supreme Court, the technological "convergence," from analog technology to digital technology, resulting in taxpayer's property becoming subject to central assessment, likely occurred in the mid-1990s. 356 Or at 317-19.

[20] To illustrate the difference between *being subject* and *subjected to* assessment, consider a house completely built as of the assessment date for tax year 2008-09, that an assessor did not notice and therefore did not assess. The house was assessable, and therefore subject to assessment and taxation. It was not, however, assessed, and therefore was not subjected to assessment and taxation.

In such cases, an exception to Measure 50 for omitted property could apply. *See* ORS 308.146(3)(d). The department makes no claim that the omitted property exception applies to this case. In addition, the department seems confused as to whether there is a difference in the operation of the omitted property exception in central assessment as opposed to local assessment. As will be discussed in Section VI (A)(3), there is no difference. *See* 22 OTR at 247-51.

[21] As discussed in this court's prior order, although the department did not formally act until tax year 2009-10, it had for some time believed that cable operations were subject to central assessment and sought legislative change to clarify the requirement. *See Comcast Corp. v. Dept. of Rev.*, 20 OTR 319, 323-325 (2011).

## VI.   ANALYSIS

As already discussed, the department's assessment clearly exceeds the 3% Limit because the department increased the MAV for taxpayer's properties by over 130 percent. The only justification the department claims for such action lies in the new property exception.

Although Measure 50 provides for the new property exception, it does not define what constitutes new property. New property is, however, defined in the implementing provisions of ORS 308.149(5)(a). To the extent that ORS 308.149(5)(a), as construed, does not conflict with Measure 50, the statutory definition controls the outcome of this case. Accordingly, the court looks to the proper construction of the provisions in ORS 308.149(5)(a).

A.   *Construction of the New Property Exception*

ORS 308.149(5)(a) provides:

"'New property or new improvements' means changes in the value of property as the result of:

"(A)   New construction, reconstruction, major additions, remodeling, renovation or rehabilitation of property;

"(B)   The siting, installation or rehabilitation of manufactured structures or floating homes; or

"(C)   The addition of machinery, fixtures, furnishing, equipment or other taxable real or personal property to the property tax account."

The department relies only on ORS 308.149(5)(a)(C) (hereinafter referred to as Sub (C)). The department's argument is that, once the department *itself* subjected all of the operations of taxpayer to central assessment, the department "created a new unit of property, as authorized by ORS 308.555, which was coterminous with the statewide unit of property for MAV calculation purposes." The department argues that the new unit of property was "add[ed]" to a new central assessment property tax account as new property.[22]

---

[22] Nothing in the Oregon Constitution, the statutes, or even the department's rules contemplates a central assessment "property tax account." The term "property tax account" refers to local property tax accounts. *See* ORS 308.142(2) (referring to ORS 308.215). In central assessment, the department conducts its

Accordingly, in the department's view, it follows that all of taxpayer's previously existing and assessable property—whether previously assessed or unassessed and whether tangible or intangible—became "new" property in tax year 2009-10.

In the context of the assessment statutes generally, there are several reasons why that reading of Sub (C) is unavailing in this case.

1.  *Property previously subject to assessment is not "new"*

The department admits that taxpayer's property, with the exception of the $86 million in new additions, previously existed, was used in taxpayer's businesses, and was previously subject to assessment. All such property had, or could have had, a MAV determined for it. As the Supreme Court held, taxpayer was subject to central assessment in respect of its cable and internet properties from the point of the conversion of analog technology to digital technology. *Comcast Corp.*, 356 Or at 317-19, 324. The fact that the department did not attempt to subject the cable and internet access property, including intangible property, to central assessment does not change that fact.

This court has already held that in the case of property existing and assessable, but unassessed, only property added in the prior *assessment year* is "new property" for purposes of applying ORS 308.149 and ORS 308.153 in preparation of a roll for any assessment year that will then lead to levy of tax in the corresponding tax year. *See Douglas County Assessor v. Crawford*, 21 OTR 6 (2012). In *Crawford*, this court observed that "new" is defined as: "'[H]aving existed or having been made but a short time; having originated or occurred lately ***.'" *Id*. at 10 (quoting *Webster's Third New Int'l Dictionary* 1522 (unabridged ed 2002)) (alteration and omission in

---

assessment and places the property on the "assessment roll," which is then allocated out to the counties. *See* ORS 308.540; ORS 308.621. However, this property is then added to a local property tax account. As will be discussed below, the "addition" to a property tax account must be made by a taxpayer. Accordingly, it does not matter whether the department or a county assessor causes the "addition" to be reflected in a property tax account.

original). This court concluded that there is, implicit in that definition, a temporal requirement. Specifically, considering the actual provisions in Oregon statutes, "'new property or new improvements'" are those that "come into being between January 1 of the preceding *assessment year* *** and January 1 of the current *assessment year* ***." *Id.* (Emphasis added.) Under *Crawford*, property that was already subject to assessment before January 1, 2008—the beginning of the *assessment year* immediately prior to the *assessment year* at issue in this case—does not qualify as new property under Sub (C).

### 2. Crawford *was correctly decided*

The department argues that *Crawford* was incorrectly decided. However, the court sees no reason to depart from its analysis or conclusion in *Crawford*.[23] Of primary importance, any argument that new property includes property acquired *prior to* the immediately preceding *assessment year* renders superfluous the statutory provisions of ORS 308.156(3) governing determination of MAV for omitted property.

Those statutory provisions, linked as they are to ORS 311.216(1), reach as far back as five years prior to the last certified roll. ORS 308.156(3)(a) requires a calculation for the first year the property is added as omitted. For that oldest year, ORS 308.156(5)(b) requires that the CPR for that oldest year be used. In short, the CPR is for the *oldest* year, not the *current* year. Those rules would not be needed if, upon discovery of property omitted from any roll in such five year look back period, the assessor could simply treat the property as "new" and determine the MAV under ORS 308.153(1)(b) based on the current RMV multiplied by the current assessment year CPR.

Nor can the *current* assessment year be a period in which a determination is made as to what, if any, new

---

[23] To clarify one statement in *Crawford*, this court noted that, where constitutional limitations are involved, "[a]n action of the assessor cannot supply the authority for the action of the assessor." *See Crawford*, 21 OTR at 9 n 3. That should be read as true for constitutional or statutory limits where action of an assessor is not stated as determinative as to the limit.

property has come into existence.[24] That is because all assessors, local and central, must complete all assessment calculations, RMV, MAV, and AV, before the current assessment year ends on December 31.[25] They must therefore have determined what "new property" exists long before the current assessment year ends.

If neither a year *prior to* the immediately preceding assessment year nor the current assessment year can be years in which the addition of "new" property is statutorily contemplated, the only year left in which the status of "new" *can* occur is the immediately preceding assessment year itself. The only year left in which the status "new" can occur, as determined in *Crawford*, is the immediately preceding assessment year itself. This conclusion as to when property is "new" is buttressed by ORS 308.149(5)(c). That statute provides that new property includes property "that on January 1 of the *assessment year* is located in a different tax code area than on January 1 of the *preceding assessment year*." (Emphasis added.)

Moreover, the statutory implementation of other MAV exceptions—not including the omitted property MAV rule discussed above—also applies to changes after January 1 of the preceding assessment year and before January 1 of the current assessment year. *See* ORS 308.156(1) (subdivided or partitioned); (2) (rezoned); and (4)(a) (disqualified from exemption, partial exemption, or special assessment). These provisions are highly relevant context, strongly

---

[24] To be clear, the current assessment year is the year in which the assessor is preparing the assessment roll. For example, as of the time that an assessor is preparing the 2009 assessment roll, the current assessment year is 2009, running January 1, 2009 to January 1, 2010, which corresponds to tax year 2009-10. As will be seen in Section VI (A)(3), it is important not to confuse the current assessment *year* and the current assessment *roll*. *See* 22 OTR at 247-51. At the time the assessor is preparing the 2009 assessment roll, the current assessment *roll* is the 2008 assessment roll, completed for the 2008 assessment year, and corresponding to tax year 2008-09.

[25] The department must prepare a tentative roll on or before June 15 of the assessment year. ORS 308.585. The Director of the department then must review, correct, and apportion the roll to the counties by August 1 of the tax year. ORS 308.600. The county assessors must print their rolls by September 25. ORS 308.219(2). Those rolls must be delivered to the tax collectors so that tax statements may be sent out by October 25. ORS 311.115. The tax statements are due payable on November 15. ORS 311.250(1).

supporting the conclusion of this court that "new" property is determined by reference to changes occurring during the *prior assessment year*—in this case, during the period January 1, 2008 to January 1, 2009.

This conclusion raises the question, as it did in *Crawford*, as to when any property asserted to be "new" came into existence or was added to a property tax account. That question is one of fact for further evidentiary proceedings.[26]

### 3. Crawford *is applicable for centrally assessed property*

In addition to arguing that *Crawford* was not correctly decided, the department argues that the analysis in *Crawford* is limited to local assessment because this court's interpretation of the meaning of "new property" in ORS 308.149(5) is not applicable to determining MAV for centrally assessed properties. The premise of the department's argument is that the central assessment procedures and tax periods to which those procedures apply differ as between local assessment and central assessment.[27]

In support of this premise, the department notes that the central assessment statute for omitted property, ORS 308.628, refers to property that "has not been assessed on the assessment roll for the year in which the roll was last certified," whereas the local assessment statute for omitted property, ORS 311.216, refers to property omitted from the "current assessment and tax rolls." The department argues that the two statutes refer to two different time periods in which property is deemed to have been "omitted."

The supporting argument and premise are simply incorrect, as will be discussed below.

### a. Local assessment of omitted property

For locally assessed property, ORS 311.216 provides that an assessor who discovers that property has been

---

[26] See Section VI (B), 22 OTR at 258, for a description of the further proceedings and associated burden of proof.

[27] Of course, the department's premise assumes that there is a legally significant connection between the assessment of RMV and the determination of MAV. That is only true when an exception event has occurred, and not otherwise.

omitted "on the *current assessment and tax rolls* or on any such rolls for any year or years not exceeding five years *prior to the last certified roll*," must proceed to assess such property as omitted property. (Emphasis added.)

To understand this provision it is helpful to analyze a hypothetical. Assume an assessor becomes aware of an omission in May 2009—which is also May of the 2009 assessment year. Assume further that the omitted property was in existence, came into existence, or was acquired by the taxpayer in the assessment year 2002. Finally, also assume that the property still exists and is still owned by the taxpayer in May of 2009.

That property should have been reflected in the assessment roll for 2003 and taxed in tax year 2003-04. Upon discovery of the omission, the assessor must add that omitted property to the "current assessment roll." ORS 311.216 - 311.232.

As discussed in *Multnomah County Assessor v. Portland Devel. Comm.*, 20 OTR 395 (2011), as of May 2009, the "current" roll is the roll for the immediately preceding assessment year or, stated differently, the roll last certified. In the hypothetical, that would be the 2008 assessment year, corresponding to the 2008-09 tax year. As of May 2009, when, in this hypothetical, the omitted property comes to the attention of the assessor, the "current roll" must be a roll that has been certified. It cannot be a roll yet to be completed. The reason for this is that until the roll is completed it would not be possible to say that any property had been either included or omitted on that roll. Therefore, the reference to the current assessment roll is not to the roll that the assessor is preparing for the 2009 assessment year (and the 2009-10 tax year)—a roll which was not yet completed and certified. Completion and certification occur in September, in the case of the hypothetical it is September 2009. ORS 308.219(2); ORS 311.105.

This does not, however, mean that the property omitted from a prior roll or rolls, and entered on those rolls by reason of the omitted property procedure, will not be shown on the roll yet to be finalized. Such property will be shown on the roll to be finalized if, as in the hypothetical,

the property still exists. The assessor, in May 2009, now knows of its existence and is required to put it on the roll being prepared for the 2009-10 tax year. ORS 308.232. The phrase "current roll" does not refer to ongoing work on an assessment roll. Rather, the proper definition of the "current roll" serves to define the "current roll plus prior 5 rolls" period of *reach back* for addition of omitted property under ORS 311.216. In the hypothetical, that period will include the assessment years 2008, 2007, 2006, 2005, 2004, and 2003.

### b.   Central assessment of omitted property

The procedures and time frames for central assessment of omitted property are, contrary to the department's argument, in all material respects, the very same as those found in ORS 311.216 to 311.232 for locally assessed property. The only difference is that those procedures, which contemplate action by the Director instead of the local assessor, are outlined in the central assessment statutes in ORS chapter 308, where the Director of the department is the relevant actor.

Under ORS 308.628, if the Director of the department determines that any property that is assessable "has not been assessed on the assessment roll *for the year in which the roll was last certified* or on the roll for any prior year that does not exceed five years prior to the year for which the *last roll was certified*," then the department is to proceed with an omitted property assessment so as to correct each certified roll, within the look back period, from which the property was omitted. ORS 308.636.

Applying these rules to a taxpayer subject to central assessment and using the same hypothetical set out above for a locally assessed taxpayer, the results would be as follows. The department discovers in May 2009 that assessable property that was in existence, came into existence, or was acquired by a taxpayer in the 2002 assessment year. That property should have been added to the roll for the 2003 assessment year and for each assessment year thereafter, to and including the 2008 assessment year, for which the roll was last certified—and which related to the tax year 2008-09, running, as it did, from July 1, 2008 to June 30, 2009.

These are precisely the same actions and timing of actions as for the locally assessed property. The use of the term "current assessment roll" in ORS 311.216 and "roll last certified" in ORS 308.628 makes no substantive difference.

The department also points to ORS 308.590(4) in making its argument about the alleged difference between omitted assessments in the central as opposed to the local assessment regimes. Here again, the department is mistaken. ORS 308.590(4) does not purport to deal with the addition of omitted property to rolls previously certified by the department. At most it addresses the process of adjusting a roll that is yet to be completed. It provides that the Director can insure that staff errors made in preparation of the "tentative assessment roll" are corrected.[28]

Accordingly, in the hypothetical example set forth above, it authorizes the Director, if necessary, to insure that the omitted property added in past central assessment years is also taken into account on the roll being completed but not yet complete or certified.

Here again, there is no difference between central and local assessment. If a local assessor has made an omitted property assessment of property that still exists, the local assessor has both the authority and duty to assess that property in the assessment (calendar) year in which the omission is discovered. ORS 308.232.

Further, in both cases, the existence of authority or duty to take omitted property into account in a roll being prepared does not mean that the rules for adding such property to prior rolls are suspended. The omitted property statutes provide no authority for the local assessor or the Director to simply add all such property to the roll then being prepared.

Addition of omitted property to the prior rolls will be at 100 percent of RMV in all cases, local or central. ORS

---

[28] Nor is it correct to assert, as the department does in its brief, that in examining the tentative assessment roll under ORS 308.590, the Director is examining and correcting the "current year roll," except, perhaps, to the extent that wording used by the department is meant to refer to the roll then currently being prepared but not yet completed. For both the local and central assessment regimes, whether the term "current roll" or "roll last certified" is used, the statutory reference is to the last roll finalized and in place.

308.232. However, a determination of MAV for any such additions of property is also necessary. For both central and local assessment, that is to be done pursuant to ORS 308.146 and will be determined under one set of rules: the rules of ORS 308.156(3) and (5). Those rules, and the constitutional provisions they implement, make no distinction as between central and local assessment.[29]

The only other discussion by the department of omitted property provisions and MAV is with respect to the provisions of ORS 308.166. The department points out that this statute states that if MAV adjustments are authorized under both ORS 308.153 (new property) and ORS 308.156 (several adjustments including omitted property), ORS 308.166(1) directs that the first adjustment is to be under ORS 308.153. This ordering rule is needed, however, when both new and omitted property adjustments are required in a property tax account. The ordering rule says nothing about whether the new or omitted adjustments are justified. Nor does it authorize "new property" adjustments to be made in cases in which omitted property adjustments were, for whatever reason, not made.

4. *The new property exception does not erase previously determined MAV*

The department argues that taxpayer's property, already assessed on an assessment roll and with a previously determined MAV, loses the constitutional and statutory MAV protections. This, the department asserts, is based entirely upon a decision *of the department* to establish a central assessment account and apply unit valuation. There is no statutory or constitutional support for such a position, and the department has not cited to any. In fact, the statutory provisions contemplate just the opposite.

ORS 308.153 provides for the calculation of the current year's MAV in situations of new property. First,

---

[29] Differences as between the assessment regimes may affect the RMV of certain property, including whether it is even assessed. That does not translate into a separate determination of MAV for that property, except that, *once an exception event has occurred*, the RMV for property subject to the exception event is multiplied by the CPR to determine the MAV for that property. *See* ORS 308.153; ORS 308.156.

the assessor calculates the MAV under the 3% Limit for all property that is not new, *i.e.*, taxpayer's property already assessed and on an assessment role, with a previously determined MAV. ORS 308.153(1)(a). Second, the assessor calculates "[t]he product of the value of the new property or new improvements" multiplied by the CPR. ORS 308.153(1)(b); *see also* ORS 308.153(2)(a). The MAV of all property in the account is the sum of the two calculations. ORS 308.153(1). The new property "exception" *only* applies to new property. It does not affect the previously determined MAV of other property.

5.  *"Addition" to the property tax account requires some action attributable to a taxpayer*

The department's argument is that the department *itself* is the actor that causes the "addition of *** property to the property tax account." ORS 308.149(5)(a)(C). To be sure, the language of Sub (C) is ambiguous in this regard because it is written in the passive voice. That leaves open the question of who, under Sub (C), makes the addition to the account. It is true that an assessor administratively causes the addition of property to be reflected in the property tax account. However, for the following reasons, the court concludes that the actual "addition" must be made by a taxpayer—not the department.

Sub (C) does not directly speak to who makes or effects the "addition of *** property to the property tax account." However, the department's interpretation conflicts with the context of the provision. In considering the context of Sub (C), the court consults two maxims of statutory construction.

The first maxim is *noscitur a sociis*, pursuant to which the court looks to the other definitions of new property contained in ORS 308.149(5)(a). Any similarities or dissimilarities among the provisions in paragraph (a) may be instructive as to the meaning of Sub (C). *See State v. McCullough*, 347 Or 350, 361 n 8, 220 P3d 1182 (2009) (quoting *Nunner v. Erickson*, 151 Or 575, 609, 51 P2d 839 (1935)).

Subparagraph (A) of ORS 308.149(5)(a) defines new property in terms of construction and renovation. These

actions can only refer to actions of a taxpayer. Subparagraph (B) of ORS 308.149(5)(a) defines new property in terms of siting or rehabilitating manufactured or floating homes. Again, these actions can only refer to actions of a taxpayer. If subparagraphs (A) and (B) contain definitions referring only to actions of a taxpayer, Sub (C) should, absent textual direction to the contrary, also be said to refer to actions of a taxpayer.[30] The department or assessor administratively cause the property tax account to *reflect* this "addition"—but they do not *add* property.

The second maxim is *ejusdem generis*, which calls for review of the other terms contained in Sub (C) itself. *See McCullough*, 347 Or at 361 n 9 (quoting *Liberty v. State Dept. of Transportation*, 342 Or 11, 20, 148 P3d 909 (2006)). Sub (C) contains some specifically listed items and two catchall provisions. The department relies upon one of the catchall provisions.

Applying *ejusdem generis*, the court looks to the specifically listed terms in Sub (C) in construing each of the catchall terms. The specifically listed terms are "machinery, fixtures, furnishings, [and] equipment." Any addition to the property tax account of these specifically listed items must be based on a physical addition, acquisition, or some other action of a taxpayer.[31]

In addition to the specifically listed terms, the legislature also added two catchall provisions, unspecified "real" or "personal property." Real property is clearly property that can only be added to a tax account as a result of an acquisition *by a taxpayer*. This leaves only the general catchall of "other taxable *** personal property." Because, as to personal property, the listed terms—machinery, fixtures, furnishing, and equipment—can only be "added" to a property tax account as a result of an action *of a taxpayer* in

---

[30] In addition, in defining what does not constitute new property, the legislature again spoke in terms of actions that can only refer to actions of a taxpayer—"General ongoing maintenance and repair" and "Minor construction." ORS 308.149(5)(b)(A), (B).

[31] ORS 308.162 authorizes assessors to merge property tax accounts. But property in the merged account has in no sense been "added" by a taxpayer to the surviving account. It is merely "reflected" in the surviving account created by the assessor.

acquiring or constructing them, the court concludes that an action *of a taxpayer* is required in respect of adding "other taxable *** personal property" to the property tax account for purposes of ORS 308.149(5)(a)(C).[32]

Once these maxims are employed, it becomes clear that the entity responsible for the "addition" is a taxpayer, not the department or an assessor.[33]

6.  *Transition to central assessment is not an exception to the 3% limit*

The department's position is that employing unit valuation and assessing intangible property for the first time somehow creates new property, even in respect to previously existing and assessed real and tangible personal property. Unit valuation is a method of determining the value of a taxpayer's property in Oregon based on an allocable share of the value of a taxpayer's property both inside and outside the state. ORS 308.550; ORS 308.555. The statement of a valuation rule for property necessarily assumes the existence of the property. A valuation rule, and its application, *cannot create property.*

The department attempts to bolster its argument by pointing to a distinction in the definition of "property" between local and central assessment. In local assessment, the department states that property means "All *property* included within a single property tax account." ORS 308.142(1)(a) (emphasis suggested by department). In central assessment, the department states that property means "the total statewide *value* of all property assessed to a company." ORS 308.142(1)(b) (emphasis suggested by department).

The department suggests that these statutes support a conclusion that a change in valuation methodology under central assessment creates new property. *See* ORS 308.550 (unit valuation). However, ORS 308.510(5) is inconsistent with that argument. ORS 308.510(5) provides that,

---

[32] With respect to intangible property, the action of a taxpayer might be the acquisition of favorable new contracts, leases, or franchises.

[33] There is no relevant legislative history to assist the court.

for purposes of determining the MAV under Measure 50, "'property' means all *property* assessed to each company that is subject to [central assessment]." (Emphasis added.) ORS 308.510(5) confirms that the focus is on *property*, not *value*. Of at least equal importance, nothing in Measure 50 or the implementing statutes provides a basis for the department's position that a transition from local to central assessment constitutes an exception event for purposes of the Measure 50 limitations.

As the court has observed elsewhere in this order, the statutory structure providing for the determination of RMV is different from the statutory structure providing for the determination of MAV. These separate structures may at times "connect." This happens when, but only when, an exception occurs and RMV must be used as part of the calculation of MAV. This occurs under ORS 308.153 and ORS 308.156, both of which deal with determination of exception value.

The basic error in the department's position is that it makes the very act of subjecting property to central assessment, and a different valuation methodology, an exception to the 3% Limit. The 3% Limit is subject only to explicitly stated exceptions. Or Const, Art XI, § 11(1). For example, the constitution does contemplate an exception to the 3% Limit for certain changes in status (disqualification from exemption or partial exemption) or valuation methodologies (disqualification from special assessment). *See* Or Const, Art XI, § 11(1)(c)(E); ORS 308.146(3)(e). However, neither the constitution nor the implementing statutes contemplate an exception for changes in valuation methodology from local assessment to unit valuation under central assessment.

As stated above, the department misunderstands the purpose of the definitions of property in ORS 308.142. Those definitions are to be used only for comparing the AV and MAV of "property" for purposes of Measure 50. For local assessment, the assessor looks at the AV and MAV for all items in the property tax account. *See Flavorland Foods v. Washington County Assessor*, 334 Or 562, 578, 54 P3d 582 (2002). For central assessment, the number is an allocable share of a unit value. ORS 308.550; ORS 308.555. The term

"value" is used instead of "property," but use of "value" does not mean new property is created, and it cannot be used to avoid Measure 50.

### 7.   *Changes in RMV do not dictate changes in MAV*

The department's final argument is that, unless a MAV is determined for taxpayer's unit of property under the new property exception, there will be no MAV for taxpayer's previously unassessed intangible property. In other words, the department's argument is that some exception to Measure 50 *must* exist. That argument ignores the fundamental reality that a change—even a big change—in the RMV of property is not an exception event for purposes of Measure 50. To exceed the 3% Limit, that change in RMV must be coupled with an exception event provided for by the constitution.

The department's argument must fail because, even if taxpayer's previously unassessed intangible property has no MAV, property lacking a MAV is not automatically considered new property for purposes of an exception event. However, where the new property exception has not been satisfied, it may be that another exception applies. Alternatively, it may be that there is a gap in Measure 50, namely, that transition to central assessment is not stated as an exception event (setting aside whether property that could have been subjected to assessment but was not subjected to assessment has some exception applicable to it).

In addition, the department's concern runs counter to the fact that there *will* be a MAV associated with taxpayer's previously unassessed intangible property. Although not yet fully briefed and argued, it would appear that the MAV for taxpayer's centrally assessed unit of property—which includes taxpayer's previously unassessed intangible property—would be equal to an aggregate sum of taxpayer's MAV from its assessment accounts in tax year 2008-09. This amount would be adjusted in accordance with the 3% Limit, and to that number would be added an MAV for taxpayer's $86 million of concededly new property, determined under ORS 308.153.

In making this line of argument, the department makes two additional statements in its reply brief that must be addressed.

First, on page 9, lines 3 through 4 of the department's reply brief, the department asserts, "Measure 50 requires that a unit of property on the assessment roll be given a maximum assessed value that is not less than its real market value on the roll." There is no textual justification for this argument in Measure 50 or the implementing statutes. In fact, this unbelievably broad assertion is *only* true where, in the first year that property is assessed, it is added using its RMV multiplied by a CPR of 1.00. The assertion also ignores that property may be subject to special assessment, and thus not assessed at its RMV. Finally, the department's assertion also ignores that the CPR might be something other than 1.00, which CPR taxpayer challenges in this case.

Second, on pages 9 and 10, the department relies on an argument supporting Measure 50 in the voters' pamphlet and argues, "There is no evidence, however, that voters intended that Measure 50 should be construed to prevent later assessment and taxation of centrally assessed property that was not on the central assessment roll in 1995." There is nothing in the text of Measure 50 that supports this assertion. Moreover, there is nothing in the text of Measure 50 that says the rules of Measure 50 apply to taxpayers except for when the taxpayer is a business.

The department's concern regarding the disparity between the RMV and the MAV associated with taxpayer's properties is an insufficient basis to conclude the new property exception applies in this case.

8.   *Conclusion as to the new property exception*

The department's action of adding taxpayer's property to the central assessment tax roll does not, absent some action or event attributable to taxpayer, qualify as an "addition" to a property tax account for purposes of the new property exception under ORS 308.149(5)(a)(C). However, that is not to say that the department cannot use the new property exception at all. At the very least, taxpayer conceded that it had $86 million in new property additions.

B.  *Further Evidentiary Proceedings are Necessary*

In their briefs, the parties touched on the issue of calculating the MAV for taxpayer's property in tax year 2009-10.[34] The record does not support a decision on this matter; further evidentiary proceedings are warranted.[35] Taxpayer has questioned the department's determination of the CPR. In addition, the department has not had an opportunity to determine and prove what amount, if any, of intangible property, or other tangible property, was added by taxpayer since the assessment date for tax year 2008-09. There may be more than $86 million in new property for tax year 2009-10.

The assignment of the burden of proof in these future proceedings bears discussion. In the Tax Court, the party seeking affirmative relief—in this case, taxpayer—bears the burden of proof, and a preponderance of the evidence is sufficient to sustain such burden. ORS 305.427.

Taxpayer seeks relief on the grounds that the department has violated the general rule established by Measure 50 and its implementing statutes. The general rule is that the MAV cannot exceed the 3% Limit. Absent some exception, if the MAV exceeds the 3% Limit, a taxpayer is entitled to affirmative relief. The MAV asserted by the department well exceeds that limit. Accordingly, taxpayer's burden of proof is satisfied.

The department seeks to avoid defeat by relying on the new property exception. A party seeking an exception to a general rule is required to prove facts sufficient to invoke that exception. *Cf. Harvey v. Davis*, 276 Or App 680, 685-86, 371 P3d 1208 (2016). This should be especially true when the general rule is of constitutional origin.

The department will be afforded an opportunity to prove whether there was additional new property for tax year 2009-10 in addition to the $86 million conceded by taxpayer to be new property.

---

[34] Among other issues that remain to be determined, is whether or how to apply ORS 308.162 (merger of accounts).

[35] It was agreed at the hearing on the scope or remand that discovery would be stayed pending the outcome of this decision.

## VII.   CONCLUSION

Property existing and subject to central assessment before the assessment date for tax year 2008-09 is not new property when it is first subjected to central assessment in tax year 2009-10. At this time, the court cannot determine a specific MAV for taxpayer's property. The parties are to confer regarding further discovery resulting from this order, and other matters still pending. Now, therefore,

IT IS ORDERED that the parties are directed to continue pursuant to this order and the rules of the court.

# APPENDIX

This Appendix illustrates the interactions between the AV, MAV, and RMV for purposes of Measure 50 and the legislature's implementing statutes. Recall that, as discussed in the body of the order, there are two limits with respect to MAV, but only the Statutory Limit provides a calculation. The Statutory Limit provides that MAV is equal to greater of either 103 percent of the prior year's AV or 100 percent of the prior year's MAV.

Neither limit is a restriction on the increase of AV. However, this Appendix illustrates the effect on the AV, as restricted by the MAV, resulting from changes in the RMV. It does not address any changes to the MAV resulting from "exceptions." The discussion in this Appendix is based on the following chart. Each year will be discussed separately.

*Illustration of Change to AV*
*based on Change in RMV as Limited by MAV*

|  | AV | % Change | MAV | % Change | RMV | % Change |
|---|---|---|---|---|---|---|
| Base | $100,000 | N/A | $100,000 | N/A | $100,000 | N/A |
| Year 1 | $100,000 | 0% | $103,000 | +3% | $100,000 | 0% |
| Year 2 | $101,000 | +1% | $103,000 | 0% | $101,000 | +1% |
| Year 3 | $75,000 | -26% | $104,030 | +1% | $75,000 | -26% |
| Year 4 | $90,000 | +20% | $104,030 | 0% | $90,000 | +20% |
| Year 5 | $104,030 | +16% | $104,030 | 0% | $125,000 | +39% |
| Year 6 | $107,151 | +3% | $107,151 | +3% | $175,000 | +40% |
| Year 7 | $110,366 | +3% | $110,366 | +3% | $180,000 | +3% |
| Year 8 | $113,677 | +3% | $113,677 | +3% | $190,000 | +6% |
| Year 9 | $117,087 | +3% | $117,087 | +3% | $210,000 | +11% |
| Year 10 | $120,600 | +3% | $120,600 | +3% | $215,000 | +2% |

**Base Year.** The base year is the year immediately preceding year 1. It is included so that any changes in year 1 can be measured. The property's AV, MAV, and RMV is $100,000.

**Year 1.** RMV remained at $100,000. Notice, however, that MAV increased to $103,000. This is because the

current year's MAV is equal to the greater of either 103 percent of the *prior year's* AV (103% x $100,000 = $103,000) or 100% of the *prior year's* MAV (100% x $100,000 = $100,000). The current year's AV, however, is the *lesser* of the *current year's* RMV ($100,000) or MAV ($103,000). Accordingly, the AV remained at $100,000.

**Year 2.** RMV increased to $101,000. Notice that the MAV remained at $103,000.[36] As explained in Year 1, this is because the current year's MAV is based on the *prior year's* AV or MAV. The current year's AV, however, increased to $101,000 (1% increase) because it is equal to the lesser of the current year's MAV ($103,000) or RMV ($101,000).

**Year 3.** RMV decreased to $75,000. The MAV, however, *increased* to $104,030.[37] This is another example of the fact that the current year's MAV is based on the *prior year's* AV and MAV. The current year's AV decreased to $75,000 (26% decrease), however, because it is equal to the lesser of the current year's MAV ($104,030) or RMV ($75,000).

**Year 4.** RMV increased to $90,000. The MAV remained at $104,030.[38] Notice the current year's AV increased to $90,000, equivalent to a *20 percent increase*, because it is equal to the lesser of MAV ($104,030) or RMV ($90,000). Recall that the 3% Limit only applies to MAV.

**Year 5.** RMV increased to $125,000. The MAV remained at $104,030.[39] The current year's AV increased to $104,030 (16% increase) because it is equal to the lesser of MAV ($104,030) or RMV ($125,000).

---

[36] The current year's MAV is equal to the greater of either 103 percent of the prior year's AV (103% x $100,000 = $103,000) or 100 percent of the prior year's MAV (100% x $103,000 = $103,000).

[37] Equal to the greater of either 103 percent of the prior year's AV (103% x $101,000 = $104,030) or 100 percent of the prior year's MAV (100% x $103,000 = $103,000).

[38] Equal to the greater of either 103 percent of the prior year's AV (103% x $75,000 = $77,250) or 100 percent of the prior year's MAV (100% x $104,030 = $104,030).

[39] Equal to the greater of either 103 percent of the prior year's AV (103% x $90,000 = $92,700) or 100 percent of the prior year's MAV (100% x $104,030 = $104,030).

**Year 6.** RMV increased to $175,000. The MAV increased to $107,151 (3% increase).[40] The current year's AV increased to $107,151 (3% increase) because it is equal to the lesser of MAV ($107,151) or RMV ($175,000).

**Years 7-10.** These years are included to demonstrate the common understanding of how Measure 50 works. In periods of rising inflation, where RMV continues to exceed MAV, the AV is limited to the three percent increase to MAV. However, it is important to recall that, as demonstrated in Years 1-6, the 3% Limit is on MAV, not AV.

For a graphical representation of all years, please see below. Note that there is relatively little movement in the MAV line, and that the AV line is restricted to the lesser of the RMV or MAV line. The RMV line is unrestricted.



---

[40] Equal to the greater of either 103 percent of the prior year's AV (103% x $107,151 = $110,365) or 100 percent of the prior year's MAV (100% x $104,030 = $104,030).