442 November 30, 2017 No. 42

IN THE OREGON TAX COURT
REGULAR DIVISION

COMCAST CORPORATION,
*Plaintiff,*

*v.*

DEPARTMENT OF REVENUE,
*Defendant.*

(TC 4909)

On remand from the Oregon Supreme Court, the parties sought resolution of the issue of the Maximum Assessed Value of Plaintiff's (taxpayer's) real property under central assessment. Also at issue were taxpayer's second through fourth claims for relief, collectively referred to by the parties as "taxpayer's discrimination claims." On remand, the parties initially disagreed on the scope of remand. Taxpayer argued that although the Supreme Court ruled conclusively against taxpayer on its first claim for relief, neither the Tax Court nor the Supreme Court had ruled on taxpayer's remaining claims for relief and they were therefore still before this court. The department argued that the only issue remaining before this court was the Measure 50 issue. The court later determined by order that all of taxpayer's remaining claims for relief, claims two through five, remained pending.

Oral argument on cross-motions for summary judgment was held March 16, 2016, in the courtroom of the Oregon Tax Court, Salem. An evidentiary hearing was held March 21, 2017, in the courtroom of the Oregon Tax Court, Salem.

Joseph M. DePew, Sutherland, Asbill & Brennan LLP, Atlanta argued the cause *pro hac vice*. Cynthia M. Fraser, Garvey Schubert Barer, PC, Portland, filed the motion and argued the cause for Plaintiff (taxpayer).

Marilyn J. Harbur, Senior Assistant Attorney General, Department of Justice, Salem, filed the cross-motion and argued the cause for Defendant Department of Revenue (the department).

Decision rendered November 30, 2017.

**HENRY C. BREITHAUPT, Judge.**

### I. INTRODUCTION

This case is on remand from the Oregon Supreme Court, and concerns the central assessment of the property

of Plaintiff Comcast Corporation (taxpayer) by Defendant Department of Revenue (the department) for tax year 2009-10.

## II.   FACTS AND PROCEDURAL HISTORY

This case has a long history regarding various challenges to the department's central assessment of taxpayer's property for tax year 2009-10. Only a portion of that history will be recited here for purposes of describing what issues remain pending for decision. The decisions and opinions referenced in this opinion provide a more complete picture of the litigation in this case.

### A.   *Procedural History*

For tax year 2009-10, the department for the first time subjected certain property of taxpayer to central assessment. This had the effect of greatly increasing the Real Market Value (RMV) of taxpayer's property because in central assessment, unlike in local assessment, taxpayer's intangible property is subject to assessment and taxation. *See* ORS 307.030(2).[1]

In August 2009, taxpayer filed a complaint in the Tax Court, alleging various facts constituting five separate claims for relief from the effects of central assessment.[2] Taxpayer made the following claims:

(1)   Taxpayer is not subject to central assessment as a communication company;

(2)   The department violated the federal Internet Tax Freedom Act (ITFA), codified at 47 USC § 151 note (1998);[3]

---

[1] Unless otherwise noted, the court's references to the Oregon Revised Statutes (ORS) are to the 2009 edition.

[2] Taxpayer subsequently amended its complaint, and added two claims for relief—collateral estoppel and *res judicata*. However, taxpayer abandoned those claims on remand.

[3] The ITFA was originally enacted in 1998 on a temporary basis and set to expire after three years. Internet Tax Freedom Act § 1101(a), Pub L 105-277, div C, tit XI, 112 Stat 2681-719 (1998). In 2001, the ITFA was extended to November 1, 2003. Internet Tax Nondiscrimination Act, Pub L 107-75, § 2, 115 Stat 703 (2001). The ITFA was then amended and extended as amended in 2004, with an operative period from November 1, 2003 to November 1, 2007. Internet Tax Nondiscrimination Act, Pub L 108-435, 118 Stat 2615 (2004). In 2007, the ITFA

(3)   The department violated the uniformity and equalization clauses of the Oregon Constitution contained in Article I, section 32, and Article IX, section 1, of the Oregon Constitution;

(4)   The department violated the Equal Protection Clause of the United States Constitution, US Const, Amend XIV, § 1; and

(5)   The department violated Measure 50—codified in Article XI, section 11, of the Oregon Constitution—and the statutes implementing Measure 50.

In August 2011, after trial, the court determined that taxpayer's property was not subject to central assessment because the primary use of taxpayer's property, cable television, was not a communication service offering data transmission services within the meaning of ORS 308.505(3). *Comcast Corp. v. Dept. of Rev.*, 20 OTR 319 (2011). Because the court determined that taxpayer's property was not subject to central assessment, the court determined that it was "unnecessary to *** address the other challenges made by [taxpayer] to the actions of the department." *Id.* at 337.

The department appealed, and the Supreme Court reversed.[4] The Supreme Court held that property owned by taxpayer and used to provide cable television, voice-over-internet protocol (VOIP), and internet services was subject to central assessment in tax year 2009-10. *Comcast Corp. v. Dept. of Rev.*, 356 Or 282, 337 P3d 768 (2014). It then remanded the case to this court for further proceedings. *Id.* at 335.

On remand, the parties disagreed on the scope of remand. Taxpayer argued that although the Supreme Court ruled conclusively against taxpayer on its first claim for

---

was again amended and extended as amended to 2014. Internet Tax Freedom Act Amendments Act of 2007, Pub L 110-108, 121 Stat 1024. It was then extended to 2015, then 2016, and ultimately made permanent in 2016. Consolidated and Further Continuing Appropriations Act, 2015, Pub L 113-235, div E, tit VI, § 624, 128 Stat 2377 (2014); Consolidated Appropriations Act, 2016, Pub L 114-113, div E, tit VI, § 633, 129 Stat 2471 (2015); Trade Facilitation and Trade Enforcement Act of 2015, Pub L 114-0125, tit IX, § 922 (2016).

[4]  Taxpayer also appealed portions of the court's judgment.

relief, neither this court nor the Supreme Court had ruled on taxpayer's remaining claims for relief and they were therefore still before this court. The department argued that the only issue remaining before this court was the Measure 50 issue.

The court resolved the dispute by order. *Comcast Corp. II v. Dept. of Rev. (TC 4909)*, 22 OTR 64 (2015) (Order on Scope of Remand). In that order, the court determined that all of taxpayer's remaining claims for relief, claims two through five, remained pending.

At the hearing on the scope of remand, the court invited taxpayer to file a motion for attorney's fees. Shortly thereafter, taxpayer submitted its motion, to which the department filed its objections. That request remains pending, and will be addressed in further proceedings for a supplemental judgment following entry of a general judgment in this case.

The first claim for relief that the court considered on remand was taxpayer's Measure 50 claim. After briefing and argument, the court issued an order detailing the principles applicable to determining the Maximum Assessed Value (MAV) and Assessed Value (AV) of property previously subject to, but not subjected to, central assessment for purposes of Measure 50 and the statutes implementing Measure 50. *Comcast Corp. III v. Dept. of Rev. (TC 4909)*, 22 OTR 233 (2016) (Order on New Property Exception to Measure 50).

Subsequently, the parties were unable to agree on the final calculation of MAV and AV and submitted letter briefing to the court on the matter. Accordingly, final resolution of taxpayer's Measure 50 claim remains pending before the court, and is decided in this opinion.

Also subsequent to the court's Order on New Property Exception to Measure 50, the court received briefing, additional evidence, and argument on taxpayer's second through fourth claims for relief, collectively referred to by the parties as "taxpayer's discrimination claims." Those claims remain pending, and are decided in this opinion.

B.  *Facts*

The record in this case includes the testimony and exhibits introduced at trial,[5] and supplemental declarations, stipulation, and testimony on remand.[6] There are two categories of facts that are relevant to this decision. The first category relates to the ultimate determination of MAV and AV for purposes of taxpayer's Measure 50 claim. The second category relates to taxpayer's discrimination claims.

1.  *Measure 50 claim*

A brief introduction of the law concerning calculation of MAV is necessary to give context to the relevant facts in this case.

In this case, MAV is determined pursuant to the statutory calculation in ORS 308.146, plus an adjustment for new property pursuant to ORS 308.153 and OAR 150-308-149(5).[7] ORS 308.146(1) provides that the MAV in the current year (here tax year 2009-10) is equal to the greater of either 100 percent of the prior year's MAV (here tax year 2008-09) or 103 percent of the prior year's AV. ORS 308.153(1) provides that the MAV in the current year is adjusted for new property by adding the product of the value of new property multiplied by the Changed Property Ratio (CPR). The calculation pursuant to OAR 150-308-149(5) will be discussed in the analysis section of this opinion.

The final calculation for the AV is straightforward. It is the lesser of either the RMV or MAV for the current year. ORS 308.146(2).

Many of the facts concerning the calculation of MAV and AV for tax year 2009-10 are not disputed.

- The RMV for tax year 2009-10 is $1,013,000,000.

- The AV for tax year 2008-09 was $244,044,900.

- The MAV for tax year 2008-09 was $434,084,202.

---

[5]  Trial was held December 10 through 16, 2010.

[6]  An evidentiary hearing was held March 21, 2017.

[7]  The new property exception to Measure 50 was the only exception to Measure 50 asserted by the department.

- The CPR for tax year 2009-10 is 1.00.[8]

- The calculation principles necessary to determine the MAV in 2009-10 are contained in the court's Order on New Property Exception to Measure 50.[9]

What is disputed by the parties is the amount of new property for purposes of Measure 50. On December 20, 2016, the parties entered into the following stipulation:

"For purposes of the 2009-2010 tax year, Comcast's net additions under OAR 150-308.149(5) [(now OAR 150-308-0150)] are $86,000,000."[10]

The department prepared a calculation of the MAV for tax year 2009-10 that equaled $520,084,202. This amount was derived as follows: To the tax year 2008-09 MAV of $434,084,202, the department added the product of new property valued at $86,000,000 multiplied by the CPR of 1.0.

Taxpayer prepared a calculation of the MAV for tax year 2009-10 that equaled $486,747,025. This amount was derived as follows: To the tax year 2008-09 MAV of $434,084,202, taxpayer added the product of new property

---

[8] The CPR is calculated pursuant to ORS 308.153(1)(b). That subsection provides that the CPR is "the ratio, not greater than 1.00, of the average [MAV] over the average [RMV] for the assessment year." Taxpayer does not dispute that the CPR is 1.00 *if new property added to the assessment roll is not part of the CPR calculation*. Taxpayer relies upon ORS 308.149(3)(c) and (4)(c) to argue that new property should be included in the CPR calculation for purposes of central assessment. If new property is included in the CPR calculation, taxpayer states "the CPR may still be 1.0 but the Department has not provided Comcast with information to determine with absolute certainty whether that is the case."

Neither party seriously engaged with this issue. Further, even if taxpayer's argument was correct, taxpayer's own brief indicates that this court lacks the necessary evidence to determine whether taxpayer's argument would make a substantive difference. This court is aware of no motion to compel filed by taxpayer requesting this court to force the department to provide the requisite information, and this court will not hold the record open any longer. Accordingly, with no evidence to show that taxpayer's construction of the CPR statutes would differ in result from the department's, this court declines to address the issue, and will treat the CPR as 1.00.

[9] The department does not dispute that the MAV in this case will be calculated in accordance with these principles, but the department *has* stated that it intends to appeal this court's Order on New Property Exception to Measure 50.

[10] This rule was renumbered to OAR 150-308-0150 in 2016, but was not materially changed. This court will cite the new numbering of the rule.

valued at $52,662,823 multiplied by the CPR of 1.0. Taxpayer calculated its new property figure by applying a depreciation percentage and a market-to-book ratio to the net additions figure of $86,000,000. Taxpayer used the department's figures to determine the applicable depreciation percentage and market-to-book ratio.

The court will address these differences, and the ultimate calculations of MAV and AV for tax year 2009-10 in the analysis section of this opinion.

### 2.  *Tax year 2009-10 discrimination claims*

With respect to its discrimination claims, which relate to tax year 2009-10, taxpayer has introduced and relies upon a significant amount of evidence that it argues shows an intentional and systematic pattern of discrimination in favor of over-the-air and radio broadcasters (collectively referred to as broadcasters), or at least against cable companies.

Although the department disputes some characterizations made by taxpayer,[11] the department does not materially dispute the evidence introduced or relied upon by taxpayer.

That evidence can be summarized as follows:

First, the department has for many years wanted to subject the intangible property of cable companies to assessment and taxation. To this end, the department made various legal arguments and submitted legislative testimony over the years, arguing, in one way or another, that cable property was subject to central assessment and taxation.

Second, when its arguments and testimony failed to achieve the intended results, the department pursued rulemaking to interpret the definition of a "communication" company to subject the property of cable companies to central assessment, which property would then include intangible property. *See* ORS 307.030(2). However, the department was unable to develop a set of neutral criteria that would subject cable companies, but not broadcasters, to central

---

[11] *E.g.*, whether certain statements made by departmental personnel can be imputed to the department itself.

assessment. The department attempted to exclude broadcasters from central assessment because it did not think they were subject to central assessment.[12]

Accordingly, and third, having failed to ascertain neutral criteria that would not also subject broadcasters to central assessment, the department issued a rule before the assessment date for tax year 2009-10 that provided that cable companies are considered "communication" companies, which are subject to central assessment. That rule was later invalided for procedural defects.[13] *See Oregon Cable Telecommunications v. Dept. of Rev.*, 237 Or App 628, 240 P3d 1122 (2010). However, the department pursued its assessment of taxpayer for tax year 2009-10 on the basis that it had the statutory authority to do so.

Fourth, at the time that the department assessed taxpayer's property for tax year 2009-10, the department was, at the very least, unable to satisfactorily indicate why the property of broadcasters should not also be subject to central assessment. However, the department now admits that both radio and television broadcasters "transmit information in electronically coded form over a distance and across a network," and that "the radio and tv broadcasting industry is comprised of communication companies involved in data transmission services."

Fifth, and finally, the department did not—and has not—subjected the property of broadcasters to central assessment, notwithstanding the fact that the Supreme Court has since held that the property of companies used in data transmission services, or "services that provide the means to send data from one computer or computer-like device to another across a transmission network" regardless of the type of technology used, are subject to central assessment. *Comcast Corp.*, 356 Or at 315.

---

[12] The department offered many reasons why it did not think that broadcasters were subject to central assessment. The precise reasons are not relevant to this decision and are therefore not discussed. It is enough to say that the department had a variety of reasons that were based on real or perceived differences between cable companies and broadcasters, none of which now withstands scrutiny under the Supreme Court's opinion as to central assessment or the record in this case for this tax year.

[13] There was no ruling on the substantive nature of the rule.

The court will address whether these facts constitute discrimination in tax year 2009-10 for purposes of taxpayer's discrimination claims in the analysis section of this opinion. Additional facts relevant to this court's analysis will be discussed below.

## III.  ISSUES

There are four issues before the court. The first issue is the determination of the MAV of taxpayer's property for tax year 2009-10. The second issue is whether the department discriminated against taxpayer in tax year 2009-10 for purposes of Article I, section 32, and Article IX, section 1, of the Oregon Constitution. The third issue is whether the department discriminated against taxpayer in tax year 2009-10 for purposes of the Equal Protection Clause of the United States Constitution. The fourth and final issue is whether the department's assessment of taxpayer's property in tax year 2009-10 violates the ITFA.

## IV.  ANALYSIS

The court will first consider the MAV of taxpayer's property for tax year 2009-10. Then, it will consider together taxpayer's federal and state constitutional discrimination claims. Finally, this court will consider taxpayer's claim under the ITFA.

A.  *MAV Claim*

The dispute regarding the MAV of taxpayer's property concerns the proper interpretation of a stipulation of fact entered into by the parties. That stipulation provides:

"For purposes of the 2009-2010 tax year, Comcast's net additions under [OAR 150-308-0150] are $86,000,000."

The parties disagree on the meaning of the $86,000,000 figure.

Taxpayer argues that the stipulation provides for the *cost* of net additions for purposes of tax year 2009-10, which must then be adjusted to determine the *value* of new property. That number can then be multiplied by the CPR of 1.0 to determine the amount of new property for purposes of calculating the MAV under Measure 50.

The department argues that the stipulation provides for the *value* of new property. The department argues that the only calculation required to determine the amount of new property for purposes of Measure 50 is to multiply the $86,000,000 figure by the CPR of 1.0.

Oregon courts interpret stipulations as they would any other agreement between parties. *May Trucking Co. v. Dept. of Transportation*, 203 Or App 564, 579, 126 P3d 695 (2006). First, the court must "determine whether the language [of the stipulation] is ambiguous by examining the text and context of the document as a whole." *Id.* If the language is unambiguous, which is a question of law, that ends the inquiry. *Id.*

If, however, the language is ambiguous, the court may consider extrinsic evidence to determine the meaning of the stipulation. *See Couch Investments, LLC v. Peverieri*, 359 Or 125, 134, 371 P3d 1202 (2016). That determination is one of fact. *Id.*

The court first looks to the text of the stipulation. It is clear that net additions are equal to $86,000,000. What is not clear from the text of the stipulation is whether the term "net additions" refers to cost or value. Accordingly, this court reviews the OAR referenced in the stipulation.

OAR 150-308-0150 is an administrative rule defining terms and providing guidance for purposes of ORS 308.149(5). Before looking at the text of the rule, the court considers the text of ORS 308.149(5)—the context for the administrative rule. ORS 308.149(5) provides a definition of new property for purposes of Measure 50:

"(a) 'New property or new improvements' means *changes in the value* of property as the result of:

"(A) New construction, reconstruction, major additions, remodeling, renovation or rehabilitation of property;

"(B) The siting, installation or rehabilitation of manufactured structures or floating homes; or

"(C) The addition of machinery, fixtures, furnishings, equipment or other taxable real or personal property to the property tax account.

"(b) 'New property or new improvements' does not include *changes in the value* of the property as the result of:

"(A)   General ongoing maintenance and repair; or

"(B)   Minor construction.

"(c)   'New property or new improvements' includes taxable property that on January 1 of the assessment year is located in a different tax code area than on January 1 of the preceding assessment year."

ORS 308.149(5) (emphases added). ORS 308.149(5) addresses what constitutes new property and describes such property in terms of *value*.

With that background in mind, this court now turns to the text of OAR 150-308-0150. That rule provides, in relevant part:

"Net Capitalized Additions

"(1)   Definitions:

"(a)   For purposes of centrally-assessed property, the term 'improvements' means *changes in the value of property* (as defined in 1997 OR Law Ch. 541, Sect. (7)(1)(b)) as the result of new construction, reconstruction, major additions, remodeling, renovation, rehabilitation or acquisition of property except on-going maintenance and repair. 'Improvements' are measured by changes in Oregon net capitalized additions as defined below.

"(b)   The term 'capitalized' refers to company expenditures for certain assets with a useful life typically extending beyond one year. These assets are aggregated in fixed asset accounts subject to annual depreciation charges, rather than repair and maintenance expense accounts. Examples include acquisitions of or changes to buildings, equipment, and personal property such as furniture and fixtures.

"(c)   *The term 'net additions' means the difference between the aggregate costs of Oregon assets in the prior and current years*. For the 1997-98 implementation year, additions include the change from the 1995-96 base year. In all subsequent years, additions include the change from the prior year.

"(d)  The term 'net capitalized additions' means 'net additions' as calculated using capitalized costs in the company's annual reports.

"* * * * *

"(3)  For purposes of computing maximum assessed value for centrally-assessed property, the aggregate Oregon net capitalized additions shall be adjusted to reflect their real market value as a result of wear, aging, and the impact of market conditions since placement in service. The net capitalized additions shall then be multiplied by the state-wide maximum assessed value to real market value ratio for centrally-assessed property (always 1.00 or less). The maximum assessed value shall be compared to the real market value, and the lesser of the two shall be placed on the roll as the company's assessed value."

OAR 150-308-0150 (emphases added).

Taxpayer argues that the use of the term "net additions" in the stipulation, and the citation to OAR 150-308-0150, gives the $86,000,000 number a particular meaning. It is "the difference between the aggregate costs of Oregon assets in the prior and current years." OAR 150-308-0150 (1)(c) (defining "net additions"). Taxpayer does not dispute that all of these additions are capitalized additions. Accordingly, taxpayer concedes that the $86,000,000 in the stipulation represents the net capitalized additions for purposes of OAR 150-308-0150(1)(d).

However, taxpayer argues that the term "net capitalized additions" only represents the *cost* of the additions, not the *value*. To corroborate its assertion that the net additions figure is one of cost, taxpayer relies upon portions of testimony during the 2010 trial in which taxpayer's witness answered in the affirmative to whether taxpayer's "new tangible personal property additions that are net or [*sic*] retired assets [was] approximately $86 million in 2009." Taxpayer's witness expected the new additions in 2008 to be roughly the same.

Pursuant to ORS 308.153(2)(a), it is the "real market value of the new property or new improvements" that is considered for purposes of Measure 50. *See also* ORS 308.149

(5)(a)(C) (defining new property as "changes in value" resulting from additions to the property tax account). Accordingly, taxpayer argues that the cost of the net capitalized additions must be adjusted to determine its value.

Taxpayer argues that OAR 150-308-0150(3) provides the key to taxpayer's adjustment of the cost of the net capitalized additions to their value. That subsection provides, in relevant part, that the "net capitalized additions shall be adjusted to reflect their real market value as a result of wear, aging, and the impact of market conditions since placement in service." OAR 150-308-0150(3).

To make the adjustment contemplated by OAR 150-308-0150(3), taxpayer relies upon testimony from the 2010 trial in which the department's witness Michael Olson described the department's process for adjusting "net additions" to determine the amount of new property for purposes of ORS 308.153(2)(a). First, the department must determine "what the market-to-book ratio is at the correlated system value." Once that ratio is determined, it is then applied to the net additions figure.

Second, the department determines a depreciation factor for the property. That factor is based in part on the depreciation expense rates reported by the company and in part on a "half-year convention" as an approximation because it may not be known when the property was placed into service. That factor is then applied to the product of the net additions figure multiplied by the market-to-book ratio.

In sum, to adjust the cost of net additions for Measure 50, the department's witness Olson explained:

> "What we would have to do is then calculate the—our estimated real market value of those net additions. We've got the net, so now we're going to have to calculate the market-to-book ratio at the system level. We're going to have to calculate the estimated depreciation expense at the system level, take 50 percent of that, multiply our net additions times the market-to-book ratio times the depreciation percentage, [that] would equal the net additions for Measure 50 purposes for the current year only."

That calculation yields what is commonly considered to be "exception maximum assessed value," which is added to the prior year's MAV as adjusted by ORS 308.146.

Essentially, taxpayer argues that use of the term "net additions" in the stipulation means that the $86,000,000 figure is one of cost as defined in OAR 150-308-0150, which rule is specifically referenced in the stipulation. Taxpayer then argues that cost figure must be adjusted as contemplated by the rule and in accordance with the department's own practices. Notably, taxpayer in its calculations uses the department's own figures for the market-to-book ratio and depreciation percentage to arrive at its figure for new property of $52,662,823.

The department disputes taxpayer's use of OAR 150-308-0150. The department argues that the reference to OAR 150-308-0150 in the stipulation was included to show that the $86,000,000 figure was the *value of new property as calculated under OAR 150-308-0150*. In support of its reading, the department argues that, at the time that the parties entered into the stipulation, the department was relying upon the court's interpretation, in its Order on New Property Exception to Measure 50, of taxpayer's concession regarding the $86,000,000 figure.

The department raises an interesting question: whether the court can consider its prior decisions in a case to interpret a stipulation made later in that same case, or whether such decisions are extrinsic evidence not to be considered unless an agreement is ambiguous.

It is a rule in contract law that the circumstances surrounding an agreement must be taken into account— they are not considered extrinsic or parole evidence. As explained in *Williston on Contracts*:

> "Ordinarily, the circumstances surrounding the execution of a contract may always be shown and are relevant to a determination of what the parties intended by the words they chose. In construing a contract, a court seeks to ascertain the meaning of the contract at the time and place of its execution. *Thus, although the parties may not, because of the parol evidence rule, testify as to agreements they made before or contemporaneously with the execution of*

*the contract, the circumstances surrounding the execution of the contract bear on the contract's meaning.*

"Some courts, not fully appreciating the distinction between the rule that permits evidence of the surrounding circumstances to be considered and the rule which prohibits the introduction of evidence of collateral agreements, have held that the former rule runs afoul of the latter, the parol evidence rule. Indeed, pronouncements can be found in numerous cases to the effect that evidence of the circumstances surrounding the execution of a contract may be admitted, like any other parol evidence, only when the contract's meaning is ambiguous.

"These decisions reflect a misunderstanding both of the scope and purpose of the parol evidence rule, and of the meaning of the phrase 'surrounding circumstances'; 'surrounding circumstances' do not embrace either the prior or contemporaneous collateral agreements of the parties *or their understanding of what particular terms in their agreement mean*. Rather, the term refers to the commercial or other setting in which the contract was negotiated and other objectively determinable factors that give a context to the transaction between the parties. Such matters as, for example, whether one or both parties was new to the trade, whether either or both had counsel, and the nature and length of their relationship, as well as their age, experience, education, and sophistication would all be part of the 'surrounding circumstances' admissible, if relevant, notwithstanding the parol evidence rule."

11 *Williston on Contracts* § 32:7 (4th ed) (footnotes omitted) (emphases added).

Prior judicial decisions are not listed as an example of "surrounding circumstances," but they are not excluded. However, even if such decisions could be considered as a "surrounding circumstance," such consideration would not help the department here. "Surrounding circumstances" cannot be considered to determine a party's "understanding of what particular terms in their agreement mean," unless the terms or agreements are ambiguous. *Id.*

The stipulation here, however, is not ambiguous. The $86,000,000 figure is specifically described as one of "net additions," which term has a specific definition in the

administrative rule specifically cited in the text of the stipulation. That definition is one of cost, and subject to the types of adjustments made by taxpayer in this case under OAR 150-308-0150(3). Furthermore, the cost value of the $86,000,000 figure was corroborated by testimony from the 2010 trial, and the type and amount of adjustments made by taxpayer are supported by evidence introduced by the department during the 2010 trial.

Because the stipulation is not ambiguous, and the dispute centers on the meaning of a term used in the stipulation, the court's statements in its Order on New Property Exception to Measure 50 are not relevant.[14]

Accordingly, the court determines that the MAV of taxpayer's property is equal to the tax year 2008-09 MAV of $434,084,202 plus net additions of $52,662,823. That results in a MAV for tax year 2009-10 of $486,747,025.

## B.   *Constitutional Discrimination Claims*

The court now turns to taxpayer's discrimination claims under the Oregon Constitution and United States Constitution.

### 1.   *Controlling law*

With respect to our state's constitution, taxpayer relies upon Article I, section 32, and Article IX, section 1. Those sections provide:

"No tax or duty shall be imposed without the consent of the people or their representatives in the Legislative Assembly;

---

[14] It is worth commenting on the court's inconsistency in its characterization of taxpayer's concession. The court variously described taxpayer's concession as one of "net tangible property additions," "new property," and "new additions." *Comcast Corp. III*, 22 OTR at 240-41, 244, 256-9. That inconsistency is not something upon which a party should rely in entering into a stipulation, and should have given the department pause when stipulating to a number for "net additions under [OAR 150-308.0150]."

In addition, the court notes that the posture of the case was, at the time the court issued its Order on New Property Exception to Measure 50, quite different than it is now. The purpose of the court's discussion of taxpayer's concession was primarily to point out that, notwithstanding the court's rejection of the department's arguments in support of treating all of taxpayer's property as new property for purposes of Measure 50, there was still an amount of new property to be calculated. The court specifically left the record open to allow further development of the total amount of new property. *See Comcast Corp. III*, 22 OTR at 258.

and all taxation shall be uniform on the same class of subjects within the territorial limits of the authority levying the tax."

Or Const, Art I, § 32.

"The Legislative Assembly shall, and the people through the initiative may, provide by law uniform rules of assessment and taxation. All taxes shall be levied and collected under general laws operating uniformly throughout the State."

Or Const, Art IX, § 1.

With respect to the federal constitution, taxpayer relies upon section 1 of the Fourteenth Amendment to the United States Constitution. That section provides:

"All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

US Const, Amend XIV, § 1.

Taxpayer, citing *Tharalson v. Dept. of Rev.*, 281 Or 9, 15, 573 P2d 298 (1978), contends that the above-cited provisions, both state and federal, are often analyzed together. The department does not dispute that contention. Although such state and federal discrimination claims are often analyzed together for convenience, Oregon's constitution is not linked to the federal constitution in this regard. In an appropriate case, a court could hold that Oregon's constitution provides greater protections than those of the federal constitution. *See id.* at 15 n 10.

The overarching principle of these provisions relevant to this case is that "taxing authorities may not single out one taxpayer for discriminatory, or selective, enforcement of a tax law that should apply equally to all similarly situated taxpayers." *Penn Phillips Lands v. Tax Com.*, 247 Or 380, 385-86, 430 P2d 349 (1967).

To demonstrate a violation of these provisions, taxpayers "must demonstrate an intentional and systematic pattern of discrimination." *Pacificorp Power Marketing v. Dept. of Rev.*, 340 Or 204, 219, 131 P3d 725 (2006), citing *Freightliner Corp. v. Dept. of Rev.*, 275 Or 13, 17, 549 P2d 662 (1976).

A showing that officials made errors of judgment is insufficient to prove a discrimination claim. *Freightliner Corp.*, 275 Or at 17, quoting *Sunday Lake Iron Co. v. Wakefield*, 247 US 350, 38 S Ct 495, 62 L Ed 1154 (1918). Indeed, the good faith of officials is presumed. *Id.* Rather than mere errors of judgment, a taxpayer must show "'something which in effect amounts to an intentional violation of the essential principle of practical uniformity.'" *Id.*

In addition to constitutional protections for equal treatment identified by taxpayer, there are also statutory provisions which in effect require equality in treatment. For example, the department is tasked with ensuring that all of the tax and revenue laws of this state are complied with, and to make an annual assessment of all companies subject to central assessment. ORS 305.120; ORS 308.515. Accordingly, if it determines that a taxpayer is subject to central assessment and taxation, the department is required to centrally assess the property of that taxpayer.

## 2. *The arguments of the parties*

The department argues that rational basis review applies to this case, which review entails two principles vital to its defense. First, that "the Equal Protection Clause does not demand *** that a legislature or governing decisionmaker *actually articulate at any time* the purpose or rationale supporting its classification." *Nordlinger v. Hahn*, 505 US 1, 15, 112 S Ct 2326, 120 L Ed 2d 1 (1992) (emphasis added); *see also Knapp I v. City of Jacksonville*, 18 OTR 22, 38 n 9 (2004), *aff'd*, 342 Or 268 (2007) (explaining that "the constitutional analysis is about conceivable justifications, not stated ones"). Second, that a challenger to the classification scheme must "negative every conceivable basis which might support it." *FCC v. Beach Communications, Inc.*, 508 US 307, 315, 113 S Ct 2096, 124 L Ed 2d 211 (1993).

Accordingly, the department posits that its assessment must be upheld if there is "any conceivable basis" that would support the department's classification between cable companies and broadcasters. *Kane v. Tri-Co. Metro. Transp. Dist.*, 65 Or App 55, 60, 670 P2d 178 (1983).

Taxpayer disagrees with the department's interpretation of the law, arguing that although governmental decisionmakers have wide discretion (*see id.* at 59, collecting cases) the any-conceivable-basis standard is tempered by the requirement that "the legislative facts on which the classification is apparently based rationally *may have been considered to be true* by the governmental decisionmaker," *Nordlinger*, 505 US at 11 (emphasis added).

Taxpayer has made several arguments attempting to prove that the department has engaged in unconstitutional discrimination against it and other cable companies, or in favor of broadcasters. Taxpayer argues that every basis upon which the department has sought to use in support of its assessment of cable companies—but not broadcasters—has been discredited. Taxpayer argues that shifting and inconsistent testimony of departmental witnesses is evidence of discrimination. Taxpayer argues that the department has determined that the property of broadcasters is subject to central assessment, but it has not pursued such property for assessment and taxation, and that the lack of pursuit amounts to intentional discrimination.

3.  *Resolving taxpayer's claims*

Resolution of this case requires particular attention to be paid to the specific action complained of, the tax year at issue, and the standard of discrimination.

First, as to the specific action complained of, it is important to note that the alleged discrimination at issue is not a legislative classification. The distinction made by the department between cable companies and broadcasters is not found in statute. Nor is it an administrative classification found in an administrative rule of the department. The action complained of here was an executive enforcement decision: the decision of the department to pursue, in the first instance in tax year 2009-10, the central assessment of cable and internet companies while also deciding not to

pursue *at the same time and for the same tax year* the central assessment of broadcasters. Accordingly, taxpayer must show that the delay (if it be that) in assessing broadcasters was, for tax year 2009-10, an act of intentional and unconstitutional discrimination against taxpayer.

Second, recall that the discrimination claims in this case pertain *only* to tax year 2009-10. Some of the evidence introduced by taxpayer relates to actions of the department after the assessment date for tax year 2009-10. To the extent that such evidence is relevant to tax year 2009-10, the court considers it. However, the court does not analyze that evidence or any other evidence as it might pertain to any other tax year.

Third, also recall that the good faith of officials is presumed. *Freightliner Corp.*, 275 Or at 17. To prove a discrimination claim, taxpayer "must demonstrate an intentional and systematic pattern of discrimination." *Pacificorp Power Marketing*, 340 Or at 219. Mere errors of judgment are insufficient. *Freightliner Corp.*, 275 Or at 17. Taxpayer must show "'something which in effect amounts to an intentional violation of the essential principle of practical uniformity.'" *Id.* (quoting *Sunday Lake Iron Co. v. Wakefield*, 247 US 350, 353, 38 S Ct 495, 62 L Ed 1154 (1918)).

In the court's view, under either the state or federal constitutions, the department's efforts to distinguish between cable companies and broadcasters do not evince discrimination against cable companies or in favor of broadcasters. In context, it simply shows that the department grappled with whether broadcasters are generally subject to central assessment. The department now appears to have determined that broadcasters *are* subject to central assessment.[15] The fact that the department took some

---

[15] The fact that radio and television broadcasters "transmit information in electronically coded form over a distance and across a network" would appear to conclusively show that broadcasters are subject to central assessment. The Supreme Court held that the property of companies used in data transmission services, or "services that provide the means to send data from one computer or computer-like device to another across a transmission network" regardless of the type of technology used, are subject to central assessment. *Comcast Corp.*, 356 Or at 315. This court does not see a material distinction between "transmit[ting] information in electronically coded form over a distance and across a network" and "send[ing] data from one computer or computer-like device to another across a transmission network."

additional time to determine whether broadcasters, as opposed to cable and internet companies, are subject to central assessment is *perhaps* evidence of an error in judgment in tax year 2009-10,[16] but it is not evidence of intentional discrimination.

The principal reason why the court finds the department's failure to subject broadcasters to central assessment to be the result of an excusable error in judgment is the impact of the Supreme Court's opinion in this case. *Comcast Corp.*, 356 Or at 282. In that opinion, the Supreme Court defined the term "data transmission services" as it relates to communication companies subject to central assessment. *Id.* at 332-33. That definition settled the question of whether *cable and internet companies* are subject to central assessment.

However, the Supreme Court refused to also hold that *broadcasters* are subject to central assessment, noting it would "resolve no dispute other than the ones before [it]." *Id.* at 330 n 26. That hesitation is important here, as it validates the department's act of considering separately—for purposes of tax year 2009-10—the question of whether broadcasters are also subject to central assessment. It also supports the department taking some additional amount of time after the Supreme Court's opinion to conclude that broadcasters *are* subject to central assessment.[17]

Presuming, as this court must, the good faith of the department, the act of pursuing central assessment of cable and internet companies first could very well be evidence of cautious review before subjecting another group of taxpayers to central assessment. In addition, the act of taking additional time after the Supreme Court's opinion could very well be evidence of cautious interpretation of the higher court's opinion. At worst, however, this court finds

---

[16] The court is wary of finding that the *deliberations* of an administrative agency are evidence of an error in judgment. The *conclusion* of such deliberations may evince an error in judgment, but the act of deliberation alone, except, perhaps, in particular circumstances, does not appear to be the type of action that should be subject to a judicial admonishment.

[17] However, what the department did or did not do after the Supreme Court's opinion does not bear on the department's intent as of when it assessed taxpayer in tax year 2009-10, or at least taxpayer has not shown why it is relevant.

the delay in determining that broadcasters are subject to central assessment to be an excusable error in judgment. It is not evidence of intentional discrimination for tax year 2009-10.

Having found that the department at worst made an error in judgment with respect to its delay in determining that broadcasters are subject to central assessment, the court now turns to perhaps taxpayer's most persuasive evidence of discrimination against cable companies or in favor of broadcasters. To date, the department has not centrally assessed broadcasters, *even though the department has now concluded that they are subject to central assessment*.[18]

The court does not find intentional discrimination here either. Taxpayer's arguments fail to put the evidence into context, given the Supreme Court's opinion on the definition of "data transmission services" and this court's Order on New Property Exception to Measure 50.

As already discussed, the Supreme Court declined to determine whether broadcasters are subject to central assessment. *Comcast Corp.*, 356 Or at 330 n 26. For purposes of this part of the analysis, the court assumes without deciding that broadcasters *are* subject to central assessment.[19]

The Supreme Court's hesitation is crucial to this point. It supports the department taking a reasonable amount of time to determine, under the Supreme Court's opinion, whether broadcasters are subject to central

---

[18] With the exception of taxpayer's wholly owned subsidiary, NBC Universal, which the department began considering for purposes of valuing taxpayer's property within the state and without the state as a unit beginning in tax year 2012-13. *See* ORS 308.550; ORS 308.555. Taxpayer argues that it is either logically inconsistent or intentionally discriminatory to consider NBC Universal, a broadcasting company also engaged in motion pictures, cable networks, and theme parks, a communication company subject to central assessment when no other broadcasters have been subjected to central assessment. These arguments, while perhaps important to any discrimination claims in tax year 2012-13 (or thereafter), are insufficient to demonstrate intentional discrimination by the department in *tax year 2009-10.*

[19] It certainly appears that they are. *See* 22 OTR at 449 n 12. In addition, the department appears to consider them subject to central assessment. (Ptf's Ex 75 at 1; Def's Resp to Ptf's 2d Req for Admiss at 2-3.) However, the court need not decide that issue to resolve this case, and therefore does not address it.

assessment. Indeed, the evidence shows that the department *did* later conclude that broadcasters *are* subject to central assessment, at or around which time the department began its Broadcasters Project to centrally assess the property of broadcasters.[20] That project began in 2016, but is now on hold.

After the Supreme Court's decision, but before the department determined that broadcasters are subject to central assessment, this court issued its Order on New Property Exception to Measure 50. In that order, the court rejected the department's method of determining MAV for newly centrally assessed taxpayers. (*See generally Comcast Corp. III*, 22 OTR 233.)

The department's new hesitation in assessing broadcasters even though it has concluded that they are centrally assessable seems permissible in light of the court's Order on New Property Exception to Measure 50. The department explained that it intends to appeal the court's order, and intends to hold off on assessing additional taxpayers until the Measure 50 issues are decided with finality. The court does not find intentional discrimination in the department's decision to delay further assessments until issues critical to the assessment process are determined with finality.[21]

Taxpayer attempts to undercut the department's explanation by pointing out that the department, in late 2014, immediately after the Supreme Court's opinion, added 175 cable and internet companies to the central assessment roll on a going-forward basis. However, again, taxpayer's

---

[20] The court notes that the department has wavered on its determination that broadcasters are subject to central assessment, even after it began the Broadcasters Project. Such hesitation is not evidence of discrimination for tax year 2009-10. However, in an appropriate case and in an appropriate year, the department's hesitation may eventually lack a rational basis and therefore become evidence of intentional discrimination.

[21] Of course, the department could simply pursue assessing broadcasters with omitted property assessments in lieu of new property assessments, which approach was almost completely spelled out in the court's Order on New Property Exception to Measure 50. Nevertheless, it is within the department's province to wait until the legal issues in this case are settled with finality before pursuing additional assessments related to the legal issues in this case.

argument fails to put the evidence into context with the timeline of decisions in this case.

The evidence cited by taxpayer shows that the department added these cable companies to central assessment *after* the Supreme Court's opinion *and before* this court's Order on New Property Exception to Measure 50.[22] That means that the department added cable and internet companies, which were determined with finality by the Supreme Court to be subject to central assessment, to the central assessment roll *before* this court concluded that the department's method of determining MAV was incorrect. Accordingly, the department was unaware that its method of determining MAV was incorrect when it assessed those cable and internet companies, but it is now aware and appears to have paused in its assessment of additional taxpayers, including broadcasters.

In sum, there is no intentional discrimination to be found with grappling initially, for tax year 2009-10, whether to also subject the property of broadcasters to central assessment and taxation. Nor is there intentional discrimination to be found in the department's act of taking time to ascertain the meaning of the Supreme Court's decision as it applies to broadcasters, while at the same time immediately adding cable and internet companies to the central assessment roll. Nor is there discrimination to be found in the department's act of placing the Broadcasters Project on hold pending the outcome of this case and the department's ultimate appeal of this court's Order on New Property Exception to Measure 50.

The court is not convinced that the department has acted in an invidious or discriminatory way under either the state or federal constitutions in centrally assessing taxpayer and other cable companies for tax year 2009-10.

---

[22] Taxpayer has pointed to no evidence of the department subjecting additional cable and internet companies to central assessment *after* the court's issuance of its Order on New Property Exception to Measure 50. The fact that the department has *continued* to assess certain taxpayers added after the Supreme Court's opinion and before this court's Order on New Property Exception to Measure 50 is of no moment.

C.   *Internet Tax Freedom Act*

The court now considers taxpayer's discrimination claim under the ITFA.[23] The ITFA prohibits two types of taxes. The first prohibition relates to taxes on internet access. ITFA § 1101(a)(1). The second prohibition relates to multiple or discriminatory taxes on electronic commerce. ITFA § 1101(a)(2).

Taxpayer has admitted that its arguments center on the discriminatory taxes prohibition. Accordingly, the court need not analyze the taxes on internet access prohibition.

In addition, taxpayer has not argued that central assessment is a "multiple" tax. Therefore, the court need only analyze whether the department's central assessment of taxpayer's property is a "discriminatory" tax.

To bring a discrimination claim under ITFA § 1101(a)(2), taxpayer must prove (1) it is engaged in electronic commerce and (2) it is being taxed in a discriminatory manner on that electronic commerce.

1.   *Engaged in electronic commerce*

Electronic commerce is defined as "any transaction conducted over the Internet or through Internet access, comprising the sale, lease, license, offer, or delivery of property, goods, services, or information, whether or not for consideration, and *includes the provision of Internet access.*" ITFA § 1105(3) (emphasis added). Internet access is defined as "a service that enables users to connect to the Internet to access content, information, or other services offered over the Internet." ITFA § 1105(5)(A).

Taxpayer has shown that, at least through its internet access business, it is engaged in electronic commerce because it provides "Internet access." Therefore this court must determine whether central assessment of taxpayer and other cable and internet companies, but not broadcasters, is a discriminatory tax on internet access.

---

[23] The ITFA is codified in a note following 47 USC section 151. The USC was last published in 2012, and therefore does not take into account the subsequent extensions to the ITFA. Those extensions and the ultimate permanency of the ITFA were discussed earlier by the court, 22 OTR at 443 n 3.

2.  *Discriminatory taxation*

"Discriminatory taxes" are defined, in relevant part as:

"(A)   any tax imposed by a State or political subdivision thereof on electronic commerce that—

"(i)   is not generally imposed and legally collectible by such State or such political subdivision on transactions involving similar property, goods, services, or information accomplished through other means;

"(ii)   is not generally imposed and legally collectible at the same rate by such State or such political subdivision on transactions involving similar property, goods, services, or information accomplished through other means, unless the rate is lower as part of a phase-out of the tax over not more than a 5-year period;

"(iii)   imposes an obligation to collect or pay the tax on a different person or entity than in the case of transactions involving similar property, goods, services, or information accomplished through other means; [or]

"(iv)   establishes a classification of Internet access service providers or online service providers for purposes of establishing a higher tax rate to be imposed on such providers than the tax rate generally applied to providers of similar information services delivered through other means[.]"

ITFA § 1105(2)(A).

Taxpayer relies upon subparts (i) and (iv) in its briefing. (*See* Ptf's Opening Br on Discrim Claims at 37-38.) Accordingly, the court need not analyze subparts (ii) or (iii). For the reasons explained below, taxpayer has not proven its claim under the ITFA.

a.   Subpart (i)

Subpart (i) prohibits taxes on electronic commerce that are "not generally imposed and legally collectible by such State or such political subdivision *on transactions* involving similar property, goods, services, or information accomplished through other means," ITFA 1105(A)(i) (emphasis added).

The emphasis on the term "transaction" is dispositive as to this subpart. The tax at issue in this case is *ad valorem* and not a tax on electronic commerce or a tax on transactions generally. It is true that by operation of the central assessment statutes and the Supreme Court's opinion in this case that companies providing internet access are subject to central assessment. However, such companies are subject to assessment and taxation *on the value of their property* in this state, as determined by reference to *the value of their property* inside and outside this state. They are not subjected to property assessment and taxation on their transactions.

Of course, it is possible that the *value* of an internet access provider's property in this state might be related to the number of *transactions* the company engages in, such as the number of internet subscribers it services, such that its intangible goodwill value increases. However, a tax on that value is different from a tax *on those transactions*. This becomes evident when one considers a hypothetical company providing internet access services to customers in Oregon but with no property in Oregon. Regardless of the number of transactions engaged in between the internet access provider and its customers, no property tax could be assessed.[24]

Taxpayer has failed to show that the department's central assessment of taxpayer's property is a discriminatory tax on transactions.

b.   Subpart (iv)

The court now considers subpart (iv). It is notable that the act of central assessment cannot be a discriminatory tax under the terms of subpart (iv), notwithstanding any alleged bad acts of the department in this case.

Subpart (iv) prohibits taxes on electronic commerce that "establish[] a classification of Internet access service providers or online service providers *for purposes of establishing a higher tax rate* to be imposed on such providers than the tax rate generally applied to providers of similar

---

[24] That provider may be responsible for other types of taxes, such as the generally applicable corporate income and excise taxes. *See* ORS chapters 317, 318.

information services delivered through other means." ITFA § 1105(A)(iv) (emphasis added).

Taxpayer has not shown by fact or law that the department's central assessment of taxpayer's property has subjected that property to a "higher tax rate" in any county in which taxpayer must ultimately pay the tax. Although taxpayer's tax burden is presumably increased in each county under central assessment (although not as high as it might otherwise have been if not for the operation of MAV), taxpayer has not introduced evidence that the associated *tax rate* in any county has changed. Instead, taxpayer's *tax base* in each county, the value of the property upon which each county's tax rate is applied, has increased.

Therefore, taxpayer has failed to prove its claim under the ITFA.

## V.   CONCLUSION

Taxpayer has shown that the MAV for its property for tax year 2009-10 is $486,747,025. Because the RMV of $1,013,000,000 is higher than the MAV of $486,747,025, taxpayer's AV for tax year 2009-10 is equal to the MAV of $486,747,025. Taxpayer has failed to prove its discrimination claims under the Oregon Constitution, the United States Constitution, and the ITFA. Now, therefore,

IT IS THE DECISION OF THIS COURT that the MAV and AV for Plaintiff's property for tax year 2009-10 is $486,747,025.

IT IS FURTHER DECIDED that Plaintiff's discrimination claims, claims two through four, are dismissed with prejudice as to tax year 2009-10; and

IT IS ORDERED that Plaintiff is directed to submit a form of general judgment that will provide for supplemental proceedings under Tax Court Rule (TCR) 68 and potentially a supplemental judgment.