IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

| | | |
|---|---|---|
| RANDALL J. HAGER, | ) | |
| | ) | |
| Plaintiff, | ) | TC-MD 180101G |
| | ) | |
| v. | ) | |
| | ) | |
| WASHINGTON COUNTY ASSESSOR, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | **ORDER GRANTING PLAINTIFF'S** |
| DEPARTMENT OF REVENUE, | ) | **MOTION FOR PARTIAL SUMMARY** |
| State of Oregon, | ) | **JUDGMENT AND DENYING** |
| | ) | **DEFENDANT'S CROSS-MOTION FOR** |
| Defendant-Intervenor. | ) | **SUMMARY JUDGMENT** |

On cross-motions for summary judgment, Plaintiff (taxpayer) challenges an increase in

the subject's assessed value by Defendant (the county) due to exception value from streets and

sewers on neighboring parcels. The board of property tax appeals sustained the county's

assessment. Defendant–Intervenor (the department) intervened to respond to taxpayer's partial-

summary-judgment motion.[1] The court holds that exception value may not be assessed because

the neighboring developments were not new land improvements to the subject and continues this

case for further proceedings on the county's counterclaim. The subject is identified as Account

R600193, and the tax year at issue is 2017–18.

/ / /

/ / /

/ / /

---

[1] Taxpayer's Motion for Summary Judgment is treated as a motion for partial summary judgment because no party's motion addresses the county's counterclaim.

## I.  STATEMENT OF FACTS

The subject is a 1.37-acre lot in Portland with a house on it.  (Stip Facts at ¶ 1; Stip Ex 4.)
It uses a septic system and is accessed via an "unimproved road."  (Stip Facts at ¶ 5.)  During the
2016–17 tax year,[2] subdivisions were developed adjacent to the subject on the north and on the
east.  (*Id*. at ¶ 2.)  As part of those developments, roads and sewer lines were brought up to, but
not within, the subject's property line.  (*Id*. at ¶¶ 2, 4.)  Taxpayer made no changes to the subject.
(*Id*. at ¶ 5.)  Photographs show that access to the newly developed roads was blocked by trees
and brush on the subject property.  (Ptf's Mot Summ J, Exs 1–2.)  The parties agreed that
although the subject continued operating its septic system it "could connect to the newly installed
sewer services."  (Stip Facts at ¶ 5.)

Because of the neighboring site developments, the county assigned the subject a 2017–18
land real market value that was $305,000 higher than it had been on the 2016–17 tax roll.  (Stip
Facts at ¶ 6.)  After netting out a decrease in improvement value, the subject's 2017–18 tax roll
real market value rose to $1,017,970, an increase from $740,190 in 2016–17.  (*Id*.)  Taxpayer
does not contest the increase in real market value.

The county also determined that the subject incurred $305,000 of exception value.
(Stip Facts at ¶ 6.)  As a result, the county increased the subject's maximum assessed value and
assessed value from $262,900 to $458,100.[3]  (*Id*.)

/ / /

/ / /

---

[2] The parties' stipulated facts do not indicate whether the development occurred before or after January 1,
2017.  As neither party argues that that date is relevant to the issues in this case, the court will assume that it is not.

[3] The increase in maximum assessed value was calculated by multiplying the exception value by the
changed property ratio of 0.640.  *See* Stip Facts at ¶ 6; ORS 308.153(1).

Taxpayer asks the court to find that the subject incurred no exception value in 2017–18. The county and the department ask the court to sustain the values on the assessment and tax roll. In the alternative, the county pleads a counterclaim asking the court to determine the subject's 2017–18 real market value.[4]

## II.  ANALYSIS

The issue is whether the sewer lines and streets adjacent to the subject were new land improvements to the subject requiring redetermination of the subject's maximum assessed value under Article XI, section 11, of the Oregon Constitution (Measure 50) and ORS 308.146(3).[5] The court holds that because the streets and sewer lines were not ready for use by the subject, they were not the subject's "offsite developments" and did not trigger the addition of exception value to the subject.

A.    *Applicable Law*

1.        *Maximum Assessed Value under Measure 50*

In 1997, Oregon voters adopted Measure 50, which limited property tax growth by changing the method for determining the assessed value of property.  Or Const, Art XI, § 11 (implemented by statute at ORS 308.142 to 308.166); *see generally Comcast Corp. v. Dept. of Rev.*, 22 OTR 233, 234–37 (2016).  Before Measure 50, a property's assessed value was generally equal to its real market value.  *Comcast*, 22 OTR at 234.  Under Measure 50, a property's assessed value is the lesser of its real market value and its "maximum assessed value."  Or Const, Art XI, §§ 11(1)(b), (f); *see also* ORS 308.146(2); *Comcast*, 22 OTR at 235.

---

[4] At the hearing, the county explained that its counterclaim was for a reduction of the subject's 2017–18 real market value to its 2016–17 level if taxpayer prevailed on his exception value claim.

[5] Unless otherwise noted, the court's references to the Oregon Revised Statutes (ORS) are to 2015.

Generally, a property's maximum assessed value increases no more than three percent each tax year. Or Const, Art XI, §§ 11(1)(a), (b); ORS 308.146(1); *Comcast*, 22 OTR at 235–36. However, there are six types of occurrence—known as "exception events"—that require a special determination of maximum assessed value, potentially increasing maximum assessed value by more than three percent in a given year.[6] Or Const, Art XI, § 11(1)(c); ORS 308.146(3). Only the first of those six exception events is relevant to this case: maximum assessed value must be specially determined where "[t]he property is new property or new improvements to property[.]" Or Const, Art XI, § 11(1)(c)(A); ORS 308.146(3)(a).

In this case, the parties do not dispute that the streets and sewer lines are new. The question is whether they are "new property or new improvements" to the subject.

2.      *Site developments*

The parties agree that new site developments would be "new property or new improvements to property" under Measure 50. Indeed, site developments have been included in the statutory definition of real property since before the passage of Measure 50. ORS 307.010(1) states, in pertinent part:

> "(1) As used in the property tax laws of this state:

> "(a) 'Land' means land in its natural state. For purposes of assessment of property subject to assessment at assessed value under ORS 308.146, land includes any site development made to the land. As used in this paragraph, 'site development' includes fill, grading, leveling, underground utilities, underground utility connections and any other elements identified by rule of the Department of Revenue.

/ / /

---

[6] Although the use of the term "exception" is well-established in legal parlance and has a basis in statute, it is not immune from criticism. *See*, *e.g.*, *Comcast*, 22 OTR at 236 n 8. Value attributable to an exception event is known as "exception value."

"(b) 'Real property' includes:

"(A) The land itself, above or under water;

"* * * * *." [7]

Thus, property includes land, and land includes "site developments made to the land." Site developments, in turn, include any "elements identified by rule of the Department of Revenue."

Although the department's rule on site developments has been renumbered, its relevant part is otherwise unchanged from before the passage of Measure 50. *Compare former* OAR 150-307.010(1) (1993). OAR 150-307-0010(2) states, in pertinent part:

"(2) Real property includes:

"(a) Land. 'Land' may be either the raw undeveloped land, or improved to the extent a site is created. A 'site' exists when land has been improved by site developments to the point that it is, or is ready to be, used for the purpose intended.

"(A) Site developments are improvements to the land that become so intertwined with the land as to become inseparable. Examples are: fill, grading and leveling, utility facilities (sewer, water, etc.), cost of developer's activities and profit that accrues to the land, including but not limited to: permits, advertising, sales commissions, developer's profit and overhead, insurance coverage, and any other improvements to the land necessary to improve it to become a site. Site developments are synonymous with site improvements, land improvements, and site preparation. Site developments consist of both 'offsite developments' and 'onsite developments.'

/ / /

/ / /

---

[7] *Former* ORS 307.010 (1991) states, in pertinent part:

"(1) 'Real property' includes the land itself, above or under water[.]

"* * * * *

"(3) 'Land' means land in its natural state. For purposes of assessment of property subject to assessment at real market value, land includes any site development made to the land. 'Site development' includes fill, grading, leveling, underground utilities, underground utility connections and any other elements identified by rule of the Department of Revenue."

"(i) Offsite developments are land improvements provided to the site. These include but are not limited to items such as streets, curbs, sidewalks, street lighting, storm drains, and utility services such as electricity, water, gas, sewer and telephone lines.

"(ii) Onsite developments (OSD) are land improvements within the site which support the buildings or other property uses. These include but are not limited to items such as grading, fill, drainage, wells, water supply systems, septic systems, utility connections, extension of utilities to any structure(s), retaining walls, landscaping, graveled driveway area. Onsite development is synonymous with onsite improvement.

"* * * * *."

Importantly, site developments include not only "onsite developments," located within a site, but also "offsite developments," which are land improvements provided to a site from outside it. ORS 307.010(1)(a); OAR 150-307-0010(2)(a)(A).

A question may arise whether site developments are better described as "property" or "improvements." Although "site developments made to the land" are included in the definition of real property found in ORS 307.010, site developments themselves are defined as "improvements to the land" by OAR 150-307-0010(2)(a)(A). Really, site developments bear characteristics of both property and improvements. Considered as improvements, they "become so intertwined with the land as to become inseparable." OAR 150-307-0010(2)(a)(A). Without implying the distinction is important, the court refers to site developments as land improvements because that term better describes their quality of having been "made to" land. *See* ORS 307.010(1)(a).[8]

/ / /

---

[8] The department's references to site developments in its briefs as "property" are apparently a convenient shorthand rather than an assertion of a relevant distinction between property and land improvements. The department takes its definition of "property" from the definition of "new property or new improvements" found in ORS 308.149(6)(a), but omits "or new improvements" from its quotation of the definiendum. (Inv's Response at 2.)

In this case, the neighboring streets and sewer lines will be land improvements to the subject if they are offsite developments of the subject.

B.    *Sites and Site Developments*

One way of determining whether land has received site developments is by determining its status as a "site." Site developments presuppose a site because they are either located "within the site" or "provided to the site." OAR 150-307-0010(2)(a)(A). Sites, in turn, presuppose site developments: "A 'site' exists when land has been improved by site developments to the point that it is, or is ready to be, used for the purpose intended." OAR 150-307-0010(2)(a). Thus, sites and site developments always exist together; if land is not a site, it has not received site developments and is "raw undeveloped land." *See* OAR 150-307-0010(2)(a).

Furthermore, land may be a site to a greater or lesser extent. Land is improved "to the extent a site is created." OAR 150-307-0010(2)(a). It is therefore not merely a question of whether land is a site, but to what extent it is a site. Land may be a site in one respect but not in another.

The test for whether land has become a site is whether site developments have improved it to the point where it is usable for some "purpose intended" in a way that raw undeveloped land is not. "A 'site' exists when land has been improved by site developments to the point that it is, or is ready to be, used for the purpose intended." OAR 150-307-0010(2)(a). Land is therefore a site to the extent it is or is ready to be used for a specific purpose.[9]

/ / /

---

[9] The county paraphrases the rule's text as stating a site exists where there are "land improvements made in the process of complying with a particular purpose." (Def's Reply at 4.) That paraphrase does not capture the text's requirement that land be "ready to be used" for the purpose intended. Developments made along the way to an ultimate goal do not leave the land "ready to be used" for that goal until all steps are complete.

The rule's provision for land becoming a site to an "extent" shows that "the purpose intended" cannot be a property-wide purpose, such as the property's highest and best use or its owner's intended use for the whole parcel. To illustrate, suppose the relevant "purpose intended" were the use of a given parcel as a residence. If such were the case, the parcel would not be a site at all until it was, or was ready to be, used as a residence. *See* OAR 150-307-0010(2)(a). Because it would not be a site, it would remain "raw undeveloped land" until it was ready for residential use, even if considerable preparation work had been done. *See id*. Likewise, once that parcel was ready for residential use, it would not be made more ready by further developments, such as sidewalks or natural gas service—the implausible result being that subsequent developments would not increase the extent to which the parcel was a site or the extent to which it was improved. The example shows that a single, property-wide "purpose intended" is inconsistent with land being "improved to the extent a site is created." The relevant "purpose intended" must be something less than the whole property's ultimate purpose.

Instead, the "purpose intended" is the proximate purpose of each new site development. Site developments are "intertwined" with the land and "inseparable" from it; they are considered part of the land. OAR 150-307-0010(2)(a)(A); ORS 307.010(1)(a) ("land includes any site development made to the land"). Every site development changes the land so that it can be used in a new way—grading and fill prepare land for building or landscaping; streets and sidewalks prepare land for use carrying foot and vehicle traffic; sewer lines allow for outflow of wastewater from land; septic systems allow for disposal of wastewater within the land; and so on. The "purpose intended" is the new way each site development allows the land to be used once it is complete.

/ / /

Not every site development stands alone; for some, the "purpose intended" is only realized with the help of another, complementary site development. Thus, OAR 150-307-0010(2)(a) uses the plural "site developments" in conjunction with the singular "purpose." The possibility of multiple site developments simultaneously realizing a single purpose is brought about when the completion of what would otherwise be an offsite development does not change the use to which land may be put. For example, a water main built off the premises of a given parcel will only enable that parcel to be used for water services after it is connected to the parcel. A utility connection is an onsite development, distinct from utility services provided from off the premises. *See* OAR 150-307-0010(2)(a)(A). In the example, the parcel would not be ready to be used for the intended purpose of the water main until an onsite development was added. Until that point, although the parcel might be improved with site developments unrelated to the water main, it is not a "site" with respect to the water main, nor "improved" by it. *See* OAR 150-307-0010(2)(a). If the parcel is not improved by the water main, then the water main does not provide improvements to it—and therefore the water main is not its "offsite development." *See* OAR 150-307-0010(2)(a)(A)(i) ("Offsite developments are land improvements provided to the site"). Once the complementary onsite developments are added, the parcel is ready to be used for the purpose intended and the water main becomes one of the parcel's site developments.

The department argues that the distinction in the rule between utility services and utility connections implies that each must be separately added, finding "no reason to include both as separate items of property if utilities are only added once they are connected." (Inv's Reply at 6.) The department's argument presumes that utility services developed outside an otherwise improved property are "offsite developments" to that property. As the above analysis shows, improvements are not provided to property until they make it "ready to be used" in a new way.

Therefore, utility services are not a property's "offsite developments" until they change the use to which the property may be put—an event that occurs when the utility connection is added. With that understanding of "offsite developments," the separate listing of utility services and connections in the rule is not pointless. It shows that the value of utility services must be included when the value of a utility connection is added. It also shows that further development of offsite services made after the connection may affect the land.

In the present case, the subject was improved by onsite developments, including a septic system and an "unimproved road" by which taxpayer accessed his home. The subject was ready to be used, and was used, for each of the purposes intended by those site developments. *See* OAR 150-307-0010(2)(a). The subject was a "site" with respect to its "unimproved road" and septic system.

The situation differed with respect to the neighboring streets and sewer lines. Although the subject "could connect to the newly installed sewer services," it was not so connected. Without a sewer connection, the subject could not be used for the purposes of sewer service. Likewise, so long as the neighboring streets terminated in trees and brush on the subject's border, they did not fit the subject for any new purpose. The subject was not a "site" with respect to the neighboring developments. *See* OAR 150-307-0010(2)(a). Therefore, the subject was not "improved" by them, and they were not the subject's "offsite developments." *See id*.; OAR 150-307-0010(2)(a)(A)(i). The neighboring developments were not land improvements to the subject.

In response to taxpayer's argument that the neighboring developments were not the subject's offsite developments because the subject was not a "site," defendants—particularly the county—argue that a developed property remains a site continually. The court agrees that a

developed property is continually a site with respect to its own site developments, including its offsite developments. However, that fact does not determine whether developments on a parcel's neighbor are offsite developments of the parcel. Where further development is required before a parcel can be used according to the purpose of its neighboring developments, those developments do not yet improve the parcel.

The department and the county make additional arguments that rely on this court's holding in *Douglas County Assessor v. Crawford*, 21 OTR 6 (2012). Because the holding of *Crawford* was abrogated by our Supreme Court after briefing was completed in this case, those arguments are now moot. *See DISH Network Corp. v. Dept. of Rev.*, 364 Or 254, 276 (2019).

Because the court holds that the neighboring developments were not improvements to the subject property, it does not reach taxpayer's remaining argument under the Oregon Constitution.

C. *Counterclaim*

The sole remaining issue is the county's counterclaim to determine the subject's real market value. Because the county challenges its own tax roll value, there is a question whether its counterclaim is justiciable. If it wishes to pursue that counterclaim, an opportunity for briefing that question will be allowed.

III. CONCLUSION

The developments on the neighboring properties were not offsite developments to the subject because the subject was not ready to be used for their purposes. Because no "new property or new improvements to property" were added to the subject during the tax year at issue, no exception value may be added. Now, therefore,

IT IS ORDERED that taxpayer's motion for partial summary judgment is granted. The subject incurred no exception value for the 2017–18 tax year.

IT IS FURTHER ORDERED that the parties shall confer regarding the county's counterclaim and file a status report proposing next steps to resolve this appeal.

Dated this ____ day of March, 2019.

_____
POUL F. LUNDGREN
MAGISTRATE

*This interim order may not be appealed. Any claim of error in regard to this order should be raised in an appeal of the Magistrate's final written decision when all issues have been resolved. ORS 305.501.*

*This document was signed by Magistrate Poul F. Lundgren and entered on March 13, 2019.*